## UNITED STATES DISTRICT COURT

### SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **KADOO PTY LIMITED** (Australian Company Number 050 142 820) as trustee for the B&D Family Trust and<br><br>**BINVID PTY LTD** (Australian Company Number 071 348 291) ATF B&D superannuation fund<br><br>**Individually and on Behalf of All Others Similarly Situated,**<br><br>Plaintiff(s),<br><br>v.<br><br>**JERVOIS GLOBAL LIMITED (ADMINISTRATORS APPOINTED) (JRV); MILLSTREET CAPITAL MANAGEMENT LLC; BRYCE ANDREW CROCKER; PETER BRENDAN JOHNSTON; BRIAN ANTHONY KENNEDY; MICHAEL CALLAHAN; DAVID ISSROFF; DANIELA CHIMMISSO DOS SANTOS; JERVOIS MINING USA LIMITED, FORMATION HOLDINGS US INC, JERVOIS SUOMI HOLDING OY, JERVOIS FINLAND OY, JERVOIS AMERICAS LLC, JERVOIS JAPAN INC, JERVOIS TEXAS LLC; JOHN DOES BEING THE DIRECTORS OF JERVOIS MINING USA LIMITED[1]** | ___ Civ. _____ (___)<br><br>(Pending) |

## CLASS ACTION COMPLAINT FOR VIOLATIONS OF U.S., AUSTRALIAN, AND CANADIAN SECURITIES LAWS, DERIVATIVE CLAIMS FOR BREACH OF DIRECTORS' DUTIES, SHAREHOLDER OPPRESSION AND CIVIL CONSPIRACY FOUNDED ON A BREACH OF FIDUCIARY DUTY

---

[1] Defendant addresses: **JERVOIS GLOBAL LIMITED (ADMINISTRATORS APPOINTED) (JRV)** (Australian Company Number 007 626 575) of 1-11 Gordon Street, Suit 2.03, Cremorne 3121 VICTORIA AUSTRALIA; **MILLSTREET CAPITAL MANAGEMENT LLC** of 545 Boylston Street, 8th Floor, Boston MA 02116 UNITED STATES; **BRYCE ANDREW CROCKER** (REDACTED), Aubonne, 1170 SWITZERLAND; **PETER BRENDAN JOHNSTON** (REDACTED), Western Australia 6010 AUSTRALIA; **BRIAN ANTHONY KENNEDY** (REDACTED), Western Australia 6031 AUSTRALIA; **MICHAEL CALLAHAN** (REDACTED), Idaho 83815 UNITED STATES; **DAVID ISSROFF** (REDACTED), Rio di Janeiro 22.793-185 BRAZIL; **DANIELA CHIMMISSO DOS SANTOS** (REDACTED), Rio de Janeiro 22.793-185 BRAZIL; **JERVOIS MINING USA LIMITED (Registered in Nevada, NV 19881021842)** of 1309 S. Chablis Street, Salmon Idaho 83467 Lemhi UNITED STATES; **FORMATION HOLDINGS US INC** (Registered in Idaho, 542958) of 1309 S. Chablis Street, Salmon Idaho 83467 Lemhi UNITED STATES; **JERVOIS SUOMI HOLDING OY** (Finland) of PL 286, Kokkola, 67101, FINLAND; **JERVOIS FINLAND OY** (Finland) of PL 286, Kokkola, 67101, FINLAND; **JERVOIS AMERICAS LLC** (Registered in Delaware) of 1309 S. Chablis Street, Salmon Idaho 83467 Lemhi UNITED STATES; **JERVOIS JAPAN INC** (Registered in Japan) of 202 Urbannet Otemachin Building, 13th Floor, Otmachi 2-chome Chiyoda-ku, Tokyo JAPAN; **JERVOIS TEXAS LLC** (Registered in Dallas) of 1999 Bryan Street, Suite 900, Dallas Texas 75201-2136 UNITED STATES.

A.      INTRODUCTION

1.  Plaintiff(s), individually and on behalf of all others similarly situated, bring this **class action** against **JERVOIS GLOBAL LIMITED (ADMINISTRATORS APPOINTED)** which is incorporated under the laws of Australia and publicly listed on stock exchanges in the United States, Australia and Canada (**JRV**). Further, this class action is brought against certain of its officers and directors, subsidiaries, controlled entities and financers for violations of **U.S. federal securities laws, Australian securities laws, Canadian securities laws** and other laws.

2.  Additionally, Plaintiffs bring this class action for **derivative claims for breaches of directors' duties** and **shareholder oppression** under the laws of Australia and Nevada.

3.  This action arises from **misstatements, omissions, and other conduct** perpetrated by Defendants. These actions and omissions, among other things, caused an artificial inflation of the company's stock price.  They influenced individuals and entities to invest and influenced them to maintain their investments.  They were relied upon by the investors in making their investment decisions.  This reliance ultimately damaged these investors.

4.  The Plaintiffs are the investors — the shareholders of JRV. The Defendants have attempted to recapitalize JRV.  Despite significant effort to do so over time, and despite a questionable need to do so, the attempt has been made without shareholder disclosure, knowledge and/or approval.

5.  As a consequence, and direct result of the extensive efforts of the Defendants, the **equity of the shareholders of JRV is to be allegedly, and imminently, extinguished** (the **Shareholder Wipeout** or **Wipeout**).

6.  The Shareholder Wipeout is being pursued through a **voluntary** bankruptcy proceeding in Texas.

7.  The bankruptcy proceeding was instigated by or with a financier known as Millstreet **Millstreet Capital Management LLC (Millstreet)**.  Millstreet was initially introduced to the company through an issue of Nordic bonds (**Bonds**), which were not properly disclosed to nor approved by the shareholders.

1

8. **The Bonds were never submitted to the shareholders for approval. The risk to the shareholders of entering into these Bonds was never disclosed** — until the Texas bankruptcy.

9. This complaint alleges **knowing participation in the breach** by a U.S. based hedge fund **Millstreet** and by **Australian directors of the company**. It is alleged, subject to discovery, both facilitated or benefited from the conduct.

10. Upon information and belief, certain Australian directors benefit through positions, compensation and equity allocations. These benefits were not disclosed to the shareholders  in advance.

11. The conduct of the Australian directors was a breach of their directors' duties.

12. The Plaintiffs seek the approval of the Court to sue the directors for a breach of directors' duties via a statutory derivative action. This is particularly important in this case given that the administrators appointed by the creditors, here by the defendant Millstreet, are unlikely to do so.

13. The Bond transaction which gave rise to the original debt was undertaken in 2021.  At the time, it was explained to the shareholders that it was in their interests.  This was purportedly the case because it permitted JRV to avoid contracting offtake agreements[2]. These agreements would commit JRV to selling minerals or metals at a predetermined price.

14. Despite not wanting to set a predetermined price, offtake agreements were nevertheless a condition of the Bond transaction.

15. Ultimately, the company entered into a series of waivers of the original debt covenants. During these waivers more and more security and assets were put into the hands of third party financier Millstreet. Through this course of conduct, Millstreet eventually and effectively controlled all of the assets of JRV.

16. The basis of the waivers, and the extent of third party control, were not effectively disclosed to Shareholders.

17. JRV was then abruptly put into a trading halt and was submitted to Chapter 11 bankruptcy proceedings in Texas.[3]  The Texas jurisdiction was attracted only by the

---

[2] An offtake agreement in mining is a long-term contract between a mining company (the seller) and a buyer (often a smelter, manufacturer, or trader) in which the buyer agrees to purchase a set amount of minerals or metals at predetermined prices or pricing mechanisms. These agreements are commonly used to secure financing for mining projects and ensure a steady market for the mined commodities.

[3] Upon information and belief, JRV had no operations in Texas.  Jervois Texas, LLC was incorporated two weeks before the Debtors filed their petition with the Bankruptcy Court.  See Jervois Texas, LLC, et al., No 25-90002, at ECF 127, Exhibit A (S.D. Tex.) February 28, 2025.

incorporation of a vehicle in Texas 2 weeks prior to the bankruptcy itself and without any notice to shareholders.

18. This action was taken without any forewarning to shareholders. It was done without any disclosure to the shareholders of these types of risks. It was done without any disclosure of the possible future need for such an extreme and drastic action.

19. All the equity of the shareholders was allegedly eliminated. The rationale was that the *vendors, customers and employees* would not be affected.   By the company's own admission, the interests of shareholders have been subordinated to the interests of other stakeholders by a series of transactions.  This breaches the most fundamental and basic obligation of the directors to act in the best interests of the shareholders as a whole. **This is a fundamental obligation that underlies capital markets in western societies and which gives investors confidence in the capital markets that drive the economies of these nations**.

20. The Plaintiffs relied on the representations made to the ASX and say they did not understand what was happening in relation to the Bonds or with Millstreet.

21. **Kadoo Pty Ltd (First Plaintiff)** says that if it had known what was planned or what would occur, then it would have sold its shares earlier.  The First Plaintiff was misled into thinking that JRV would trade through the depressed commodity prices, or would sell assets and give the surplus back to the shareholders.  In fact, at some point, subject to discovery, the company's directors knew or ought to have known that the scenario would, or may, unfold and that the shareholders' equity would be extinguished.  The directors were obligated under various securities and other laws to disclose this to investors.

22. Even if the directors acted properly in the initial Bond transaction, as matters unfolded, and more and more security was granted over additional assets, and as more risk was manifest to the shareholders, the directors should at a later point have disclosed this fact and this issue to the shareholders.  The shareholders clearly would have wanted to know these material and critical facts.  The directors were obligated to make this disclosure of material price sensitive information.  They did not.

23. In addition, the directors preferred their own interests over the interests of shareholders as is further provided for herein.

24. The entry into the Bond transaction, or the transactions as a whole including the Chapter 11 Bankruptcy, constituted a disposal of the main undertaking of the company such that shareholder approval was required.  It was not obtained.  The result was the shareholder Wipeout.

25. This conduct was clearly oppressive to the shareholders of JRV.

26. Upon information and belief and subject to further discovery which may be revealed through this matter, it constituted a scheme which supports an action under civil conspiracy laws to defraud the shareholders of their equity interests in JRV.

---

### B.  CLASS ACTION ALLEGATIONS

27. Plaintiff(s) bring this action as a class action pursuant to **Federal Rule of Civil Procedure 23** on behalf of all persons and entities who purchased or otherwise acquired Defendant's securities **on or after July 5, 2021** until the trading halt on **January 2, 2025** (being the date of the trading halt) (the **Class Period**), including securities traded on the **Australian Securities Exchange (ASX), Over-the-Counter (OTC) market in the United States, and the Toronto Stock Exchange (TSX) in Canada (Class).**

28. The Class is so numerous that joinder of all members is impracticable. The exact number of class members is unknown at this time but can be determined through Defendant's records and stockholder reports.

29. Common questions of law and fact exist as to all class members and predominate over any questions affecting only individual members. These common questions include, but are not limited to:

    a.  Whether Defendants violated U.S., Australian, and Canadian securities laws;

    b.  Whether Defendants made materially false and misleading statements;

    c.  Whether and to what extent Defendants acted with scienter (intent to defraud);

    d.  Whether and to what extent the market prices of Defendant's securities were artificially inflated due to Defendants' conduct;

    e.  Whether the conduct of the Defendants was oppressive to shareholder rights;

    f.  Whether there was a breach of directors' duties in one or more jurisdictions;

    g.  Whether class members have sustained damages and the proper measure of those damages.

30. Plaintiff(s) claims are typical of the claims of the Class, as all class members sustained damages from Defendants' common course of conduct.

31. Plaintiff(s) will fairly and adequately protect the interests of the Class and have retained competent counsel experienced in securities litigation.

4

32. A class action is superior to other available methods for the fair and efficient adjudication of this controversy because:

    a. it avoids the need for potentially inconsistent adjudications;

    b. individual damages suffered by class members may be too small to justify individual lawsuits;

    c. it provides an effective method for redress of injuries to investors worldwide.

---

## C.    JURISDICTION AND VENUE

10. This Court has **subject matter jurisdiction** pursuant to:

    a. **15 U.S.C. § 78aa (Exchange Act)** and **28 U.S.C. § 1331 (Federal Question Jurisdiction)** for violations of U.S. securities laws.

    b. **28 U.S.C. § 1367 (Supplemental Jurisdiction)** over claims arising under **Australian, Canadian, and other related corporate and state laws**, as they form part of the same case or controversy, arise from the same common nucleus of operative fact and under principles of international comity.

    c. This Court has the authority to grant relief consistent with the Australian Corporations Act and/or apply principles of corporate equity in the interests of justice.

11. Venue is proper in this District pursuant to **15 U.S.C. § 78aa** because:

    a. A substantial part of the events or omissions giving rise to the claim occurred in this District.

    b. Defendant(s) conduct business in this District.

    c. At least one Defendant resides in this District or did reside in this District during the Class period.

    d. U.S. investors were harmed by the fraudulent conduct.

---

## D.    FACTUAL ALLEGATIONS

## D.1    INTRODUCTION AND DEFENDANTS

13. At all material times JRV was listed on the following stock exchanges: Australian Securities Exchange (**ASX**) (ASX: JRV); Toronto Stock Exchange (**TSX**) (TSX-V: JRV) and the United States Over-The Counter Exchange (**OTC**: JRVMF).

14. JRV has 2,702,763,785 common shares outstanding.

15. JRV engaged in conduct that affected U.S. and New York investors; it maintains U.S. operations known as the Idaho Cobalt Operations (**ICO**); it has engaged in actions which have actively solicited U.S. and New York investors, its securities are traded in the U.S. and New York on the OTC; its actions, omissions, and misrepresentations impact U.S. and New York investors; JRV and the Defendants' Amended and Restated Restructuring Agreement, a material component of the parallel proceeding in the United States Bankruptcy Court for the Southern District of Texas, was approved by the Bankruptcy Court, and maintains a jurisdiction clause that submits the parties to the laws and jurisdiction of the State of New York; Defendant David Issroff at the time of the transactions alleged herein was domiciled or based in NY during some of the Class period; All but one attorney of record for the Debtors in the parallel proceedings is located at: 787 Seventh Avenue New York, New York 10019.

16. JRV is a miner and processor of cobalt and nickel.

17. JRV has operations in the USA known as the Idaho Cobalt Operations (**ICO**), Finland (known as **JFO**) and Brazil (known as **SMP**). Over the past few years, it has suffered (relative to its forecasts) from a deterioration in commodity prices due to increased supply from China.

18. The minerals in question are in the U.S. Department of the Interior's Final 2023 list of critical minerals. The Energy Act of 2020 defines a "critical mineral" as a non-fuel mineral or mineral material essential to the economic or national security of the U.S. and which has a supply chain vulnerable to disruption.[4]

19. ICO is the only cobalt mine in the United States.[5]

---

[4] Link to Energy Critical Minerals List Information

[5] The 10% additional tariff that the United States imposed on Chinese imports in February 2025 applies to cobalt and nickel and is in addition to existing duties including the 25% tariff imposed as of September 2024 for refined Chinese cobalt. As the main deterioration in commodity prices was due to increased supply from China, with tariffs implemented against imports from China in September '24 and February '25, including for cobalt and nickel, arising to an aggregate 35%, upon information and belief, the downward pressure on JRV due to Chinese imports was matterally relieved in late '24 and February of '25.

Nevertheless in February of '25, it was abruptly put into a trading halt, was submitted to a Chapter 11 bankruptcy proceedings in Texas, and its shareholders were wiped out.

20. The US Department of Defence is an interested party, having contributed US$15M funding to the ICO.

21. JRV and certain of its related entities, Formation Holdings US Inc; Jervois Mining USA Limited; Jervois Suomi Holding Oy (Finland); Jervois Americas LLP and Jervos Japan Inc and Jervois Texas LLC (**JRV Entities** or **Debtors**) are are now subject to Chapter 11 bankruptcy proceedings in the United States District Court in Houston, Texas.  The structure of the JRV bankrupted entities is in Annexure A.  JRV and its group (**Group**) has other entities that were not subject to the bankruptcy proceeding.

22. On January 2, 2025, JRV entered into a recapitalisation agreement with Millstreet (**RSA**), the terms of which have not been provided to the market.

23. On January 14,  2025, Jervois Texas LLC was incorporated for the sole purpose of attracting the bankruptcy jurisdiction of the Texas bankruptcy court.

24. On March 6, 2025, in the bankruptcy proceeding, the shareholdings of the JRV shareholders including the Plaintiffs were, allegedly, extinguished.

25. On 12 March 2025, JRV entered into voluntary administration in Australia.  David Hardy and Gayle Dickerson of KPMG, 727 Collins Street, Docklands, Melbourne, Victoria 3008  were  appointed as Joint Administrators.

## D.2     PLAINTIFFS

26. The Plaintiffs held shares in JRV through the ASX at material times for the purposes of this claim.  Their share buy-sell data  is available on request from Counsel for the Plaintiffs.

27. The First Plaintiff, Kadoo Pty Limited, first acquired shares on ASX on October, 16 2017.  It acquired and sold shares until March 1, 2022. It then acquired further shares between November 18, 2022 and July 25, 2024.  Currently, it holds 10,205,373 shares in JRV listed on ASX.

28. The Second Plaintiff, Binvid Pty Ltd, first acquired shares on ASX on November 21, 2017.  It continued to acquire and sell shares until June 4, 2024.  It does not currently hold any shares in JRV.

## D.3     JRV DIRECTORS

29. Until its administration, JRV had a head office in Cremorne, Richmond (Victoria, Australia).

30. JRV has a long-standing CEO and Executive Director, Bryce Crocker, a mining executive from Bendigo Victoria, Australia now located in Switzerland.

7

31. JRV is governed by a Board comprising Crocker (appointed 10.01.2017), a Non-executive Chairman, Peter Johnston (appointed 1.07.2018) and 4 other non-executive directors Brian Kennedy (appointed 10.1.2017) ; Michael Callahan (appointed 07.24.2019); David Issroff (appointed 09.03.2021) and Dr Daniela Chimmisso dos Santos (appointed 12.01.2022) (each a **Director** and together the **Board** or the **Directors**).

32. All of the Directors were appointed at the time of the RSA.

33. Crocker, Johnson, Kennedy and Callahan, were in place at the time of the entry into the original             Bonds             for             the             ICO.

## D.4    MILLSTREET

34. Millstreet is a hedge fund based in Boston (www.millstreet.com); a "SEC-registered investment adviser, which invests on behalf of endowments, foundations and other institutional investors with the goal to compound superior absolute returns that are uncorrelated to traditional asset classes."  It advertises that it has a "disciplined, proven and repeatable investment process within a niche market."

35. Millstreet's stated investment philosophy includes: "Typical credit investments are defined by *less levered balance sheets*, *high free cash flow yields*, *more restrictive debt covenants*, *superior collateral packages*, *shorter durations*, *inherent catalysts and higher total return potential*." (*emphasis added*).

36. Millstreet held the majority of the Bonds.

## D.5    BONDS AND SUBSEQUENT EVENTS (2021)

37. On July 5, 2021, JRV entered into the Bonds which were known as "Nordic Alternative Bonds." The Bonds were on restrictive terms; with significant debt covenants.

38. The Bonds were entered into on  July 16 2021 by a subsidiary of JRV, Jervois Mining USA Limited, a company registered in the State of Nevada with registration number NV19881021842) (**Jervois USA**) and Nordic Trustee AS (a company existing under the laws of Norway with registration number 963 342 624).

39. Nordic Trustee (see nordictrustee.com) advertises itself as the "leading bond trustee and loan agency provided in Northern Europe". Nordic says that its clients are "Nordic blue-chip borrowers, Nordic and international banks, municipalities, as well as larger Nordic and international institutional investors and lenders".

40. The Guarantors of the Bonds were JRV and Formation Holdings US Inc (a company existing under the laws of the State of Idaho with organisational identification number 542958), which was at that time stated to be 100% owned by JRV.

41. As pleaded above, the Bonds were issued in majority to Millstreet, whose stated business strategy was to invest in distressed assets under such terms.

42. On July 5, 2021, the Initial Bond Transaction was announced. There was a statistically significant change to the stock price on July 5 2021, being the date the Bonds were announced.  No shareholder approval was sought or obtained for this Transaction.

43. On July 6, 2021, the Board approved the full construction of ICO.

44. On July 22, 2021, the Initial Bond Transaction settled.

45. On July 27, 2021, JRV announced the acquisition of 100% of Freeport Cobalt for US$160M.

46. On July 27, 2021, David Issroff was appointed as a director.

47. On July 28, 2021, JRV announced the completion of a placement and the institutional component of a 1 for 1.56 accelerated non-renouncable entitlement offer announced on 27 July 2021; raising $136M (**Placement**).

48. On 27 to 28 July 2021, the stock in JRV crashed.

## D.6    DETAILS OF THE BOND DOCUMENTS

49. The terms of the Bond document were provided on a website known as www.sedar.com.   The terms of the Bonds were never provided directly to the shareholders of JRV.

50. The underlying finance documents (containing security) and the guarantees have never been made available to the shareholders.

51. The Bonds are very sophisticated financial instruments in the form of secured debt obligations.

52. The Bonds are said to be registered on "CSD", which means the central securities depository in which the Bonds are registered, being Verdipapirsentralen ASA (VPS).

53. The terms of the Bond are complex and unusual for the Australian market, being a form of Nordic alternative financing.

54. The Bonds were listed (cl4).

55. The Bonds were for US$100M (cl 2.1(a); related to the ICO Project (cl 2.3).

56. They were first priority bonds, constituting secured senior debt obligations of Jervois US.   The Bonds were secured by the "**Transaction Security**' (cl 2.5) which includes

among other things: the escrow account ; all of the material assets of Jervois US including material assets, lands, fixtures, as-extracted collateral, tangible and intangible personal property, permits and contracts and insurances (cl 2.5(vii). This constituted the entirety of the ICO business.

57. It was a condition of the Bonds (cl 6) that the trustee receive various expansive documents, including a project construction plan, the budget and appointed an independent engineer. In essence, variations required the Bondholder to agree, putting the Bondholders in control of the project.

58. There was a condition of the first disbursement of funds that $50M of project equity needed to be contributed by JRV to an escrow account (see cl 6.1.2(c) and the definition of Project Equity Contribution) and that JRV has raised $50M of gross cash proceeds from an equity issue after 30 June 2021 (cl 6.1.2(e)).

59. Further, there was a condition that an SMP Cobalt Offtake Contract has been executed. In particular, this locked up offtake agreements for 3 years.

60. It was a condition of the second disbursement of funds that JRV held directly or indirectly 51% of SMP; that SMP owned 100 per cent of the SMP refinery and related assets and that the SMP Cobalt Concentrate Offtake Contracts remain in effect and enforceable; or that there were executed Offtake Agreements or that there were Concentrate Sales Agreements and Toll Refining Agreements in force (see cl 6.1.3). (Later, post-acquisition, on 9 September 2024 Millstreet would move to take security directly over SMP in return for a waiver.)

61. The Bonds matured on 20 July 2026 (cl 10.1), which was 5 years from the date of signing.

62. Interest was payable every 6 months, with the first interest payment date of 20 January 2022. It is not known and will need to be the subject of discovery and expert evidence whether JRV had the ability to cover the interest.

63. The interest rate was 12.5% per annum plus 3% penalty interest (cl 9.1).

64. There was a guarantee by the parent JRV, which was not made public.

65. Significant project controls were applied (see cl 12).

66. The financial and operational covenants were stringent and significant, including no distributions to the shareholders (cl 13.2.13).

67. JRV undertook to procure that all Group Companies would comply with the undertakings (see cl 13). It included that no material change was made to the business carried on by the Group (which makes it clear that the Bond related to a very significant

undertaking of the Company). Specific issuer liquidity, group liquidity and book equity ratios needed to be maintained (cl 13.4).

68. In the event of default which included non-financial obligations not remedied within 20 Business Days of knowledge or notice, Representations or cross default (cl 14.1) , there were provision for the acceleration of the Bonds (cl 14):  the ability to declare all outstanding bonds due and payable; to exercise all rights under the finance documents.

## D.7    FAILURE TO DISCLOSE OR EXPLAIN AND SEEK SHAREHOLDER APPROVAL

69. The terms of the Bond documents were not fully disclosed to the shareholders including the Plaintiffs in the announcement on July 5, 2021 (**Bond Announcement**) or at all.

70. The full form finance documents and guarantee were not provided and are not public.

71. None of these documents, nor the entry into the Bond transaction, were approved by the shareholders.

72. The Plaintiffs did not understand the terms or implications of the Bonds.  The Plaintiffs are sophisticated and are representative of the class of ordinary shareholder.

73. No ordinary person would understand the terms of the financing documents, particularly without having the benefit of the Bond documents, or from the Bond Announcement on July 5, 2021.

74. The Bond Announcement did not meet the requisite standard of disclosure to ensure that the market was fully informed and was misleading, as it did not contain in explicit terms:

    a.  The extent of the Transaction Security described in paragraph 59, referring only in express terms to the escrow account and not the full security, and failing to explain in detail the security taken over the cobalt mine and the offtake;

    b.  the project control to be exercised by Millstreet;

    c.  the detailed bond terms (which were hidden and difficult to find on sedar) simply stating that "readers are urged to refer to the full terms and conditions of the Bonds", which were not in fact provided;

    d.  did not explain any or all of the implications for JRV or the shareholders; and/or

    e.  did not provide the full form of the financing or guarantee documentation;

    some or all of which was a material omission (**Bond Representation**).

75.  No shareholder approval was sought for the entry into the Bonds.

76. At no point has JRV stated that it could not pay interest on the Bonds or that it needed capital to do so.

### D.8    PURPOSE OF THE BONDS AND INITIAL MISREPRESENTATIONS (2021-2022)

77. The purpose of the Bond Announcement was expressed to be as follows:

    a.    the headline of the announcement stated that "*Commercial Flexibility Preserved*";

    b.    The Bond Announcement stated that the bond issue is "payable in mid-2026 and *preserves commercial flexibility* through ICO construction by "*not obliging Jervois to irrevocably commit cobalt supply early*"; (**First Shareholder Value Representation**);

    c.    "*Jervois is not required to enter into an external off-take agreements for ICO concentrates*, except in certain limited circumstances at a later date, under the Bond Terms. The Company will continue with plans to process the concentrates at the Sao Miguel Paulista refinery…Jervois' commercial team plans to sell refined cobalt products from SMP to key customers across the US and potentially Europe, Japan and South Korea;"

    d.    "This *sales strategy is expected to maximise value for shareholders versus committing to an early sale of significant voles of ICO cobalt concentrates in external offtake agreements*" (**Second Shareholder Value Representation**).

78. On **July 22, 2021**, JRV made an announcement regarding the settlement of the Bonds for $100 million and repeated the First Shareholder Value Representation.

79. On **January 31, 2022**, the Quarterly Activities report was released containing a number of positive statements about JRV and the business.

80. On **February 7, 2022**, the $50M bond drawdown was completed from the escrow account. JRV repeated that further information regarding the bonds was described in the Bond Announcement.

### D.9    FURTHER CAPITAL RAISES, ISSUE OF INCENTIVES TO MANAGEMENT, INTERIM REPRESENTATIONS (JUNE 2023 - MAY 2024)

81. On **June 28, 2023**, JRV announced that it was raising $50 million to "support a new strategy, responding to historically low cobalt prices; and that Millstreet, a large holder

of ICO Bonds, was to subscribe for *all* convertible notes." (**First Historically Low Prices Representation**).

82. On **July 20, 2023**, JRV announced that it had conducted a further capital raise of $50 million comprising a US$25M issuance of unsecured convertible notes and a concurrent fully underwritten 1 for 3.34 accelerated non-renouncable entitlement offer to raise $25M (**Convertible Notes**).

83. The stated purpose of the Convertible Notes issue  as expressed in the July 20, 2023 Announcement (**Convertible Notes Announcement**) was to:

   a. "Strengthen Jervois' balance sheet, improve liquidity and working capital flexibility and to reduce debt"; and

   b. That the current gearing and constrained liquidity were impacting shareholder value and that the capital raising accelerated de-leveraging, increases financial flexibility and mitigates risk; and

   c. There would be improved flexibility to deliver a leading diversified nickel and cobalt platform when expected market recovery occurs; and

   d. There was "positioning in the downturn for the delivery of multi-asset operations from as early as 2024 - ICO; NiCo  Young Australia; SMP Brazil; Jervois Finland and USA";and

   e. There was flexibility and runway to support the execution of the business plan and that the capital raise further de-risks compliance with

      (**Third Shareholder Value Representation**).

84. On **September 1, 2023**, Millstreet closed its second subscription for $25M of convertible notes, following shareholder approval.  This is now the key unsecured debt in the bankruptcy proceeding.

85. On **January 30, 2024**, JRV announced that it was continuing to implement a "*refocused strategy to ensure the business can be financially sustainable and self-funding at historically low cobalt prices caused by the PRC oversupply from the Democratic Republic of Congo and Indonesia; and that a key strategic objective is for Jervois to de-risk the path to establishing a multi-asset plan underpinned by a durable capital structure; and that it was pursuing initiatives across its asset portfolio to meet this objective, including in response to inbound interest*" (**Fourth Shareholder Value Representation**); and (**Second Historically Low Prices Representation**).

86. On **January 30, 2024**, JRV announced that it received its results from the surface drilling campaign at the Sunshine deposit, which were fully refundable by the US

Department of Defence Defence Production Act, Title III US$15 million grant award and stated that cobalt was on the critical minerals list.

87. On **March 7, 2024**, JRV announced (**Incentives Announcement**) that:

    a.  it had "implemented further cost reductions across its business in response to adverse cobalt market conditions caused by Chinese overproduction and its impact on pricing";

    b.  "*Jervois has reduced senior corporate management roles, with 30% of positions made redundant or part-time. Jervois thanks affected individuals for their contributions and for those transitioning to part-time, their flexibility.* Jervois Non-Executive Directors will also reduce their fees by 30%, effective 1 February 2024.

    c.  No awards under the Company's Short Term Incentive Plan will be made to the Chief Executive Officer, executive and corporate management team. Jervois has also frozen annual salary increases (generally linked to inflation) for 2024 across the corporate group, and at its sites, where legally permissible;

and made an implied representation by the context of the Incentives Announcement that no incentives awards were being made to management (**Incentives Representation**).

88. On **March 18, 2024**, the report for the year ended December 2023 was released, containing a number of statements from the Chairman, including:

    a.  "Difficult year for JRV with cobalt price weighed down by additional supply from China and share price performance difficult";

    b.  "However we have continued to progress our relationships with both industry and government as we position the Company for improved market conditions";

    c.  We have implemented cost reductions across the Company including a significant reduction of senior corporate management roles.  The non executive directors of the Jervois Board unanimously agreed to reduce their cash compensation by 30% effective from 1 February 2023";

    d.  "At our SMP refinery in Brazil, we are assessing partnership opportunities…";

    e.  "We thank our shareholders for their support over the past 12 months, particularly those who supported our capital raising activities, which have helped sustain our business during a challenging time."

f.  "Our focus remains on establishing and strengthening partnerships with commercial partners, industry and governments and we envisage positive shifts across our portfolio during 2024".

g.  "As customer inventory levels remain low, we expect this will lead to supply and price shocks and, on the back of the introduction of the Inflation Reduction Act in the U.S., we have seen a significant pick-up in customer enquiries across Japan, South Korea, and the U.S. for cobalt which complies with this legislation from the start of 2025. W*e are confident of improved cobalt market conditions in the future as demand accelerates and continue to focus on best positioning our assets to benefit from this. I hope you will continue to support Jervois as we move towards more positive territory* ",

(**Fifth Shareholder Value Representation**).

89. After the December 2023 report, from March 27, 2024 to April 11, 2024, JRV made several positive announcements about the progress of the business, including drilling results.

90. On **April 3, 2024**, JRV issued its notice of annual general meeting (**2024 AGM**) which included resolutions relating to the issue of performance rights.  In relation to the CEO, the following statement was included:

"*The Company proposes, subject to Shareholder approval of this Resolution 9 and Resolution 10 below to grant Chief Executive Officer, Mr Bryce Crocker up to 31,767,022 performance rights which, upon vesting, will result in the issue of up to 31,767,022 Shares pursuant to the Company's Performance Rights Plan approved by Shareholders. The provision of Performance Rights to Mr Crocker pursuant to the Performance Rights Plan comprises a significant component of his 'at risk' remuneration. These Performance Rights are intended to align Mr Crocker's long-term performance over the vesting period with the interests of Shareholders*. "

(**Sixth Shareholder Value Representation**).

91. A further resolution proposed, and later passed, was to *reduce the option exercise price* payable by a number of directors and management, including: Peter Johnston, Brian Kennedy, Michael Callahan, Bryce Crocker, Alwyn Davey, Kenneth Klassen, Greg

Young, James May, Matthew Lengerich, Sami Kallioinen.

92. Other resolutions included: adoption of the remuneration report; re-election of Brian Kennedy; Peter Jonston; Michael Callahan; David Issroff; re-approval of the stock option plan; and the approval of the performance rights plan, as amended. Apart from the re-appointment of the auditor, all resolutions proposed and passed at the 2024 AGM were for the benefit of directors and management.

93. On **April 30, 2024**, the quarterly activities report stated that there was a tightening of costs, a 30% reduction in senior management positions and a reduction of non-executive director fees by 30%; The report also stated that JRV "continued to focus on initiatives to ensure its business remains financially sustainable at historically low cobalt prices caused by the People's Republic of China, oversupply from the Democratic Republic of China and Indonesia (**Third Historically Low Prices Representation**).

94. Further on **April 30, 2024**, JRV announced (among other things) that:

    a. Cost reductions and delivery of improvement initiatives continuing to progress resilience to cobalt price weakness;

    b. A number of positive statements on progress;

    c. "Review partnership opportunities to crystallise and demonstrate value; initiatives across all assets are continuing - objective is to strengthen the balance sheet and support strategic delivery";

    d. "Lenders are actively engaged in asset partnering initiatives"; and

    e. "Priorities to continue to ensure that the business is financially sustainable."

    f. "Asset partnering initiatives to strengthen the balance sheet are being reviewed in conjunction with lenders. Significant work has been completed with high-quality potential counterparties on asset-level investment opportunities since mid-2023. Several third parties have been advanced. "

    g. A key objective of the review is to better balance ownership across the portfolio, alleviating pressure on Jervois' balance sheet, and to provide liquidity that supports progression toward Jervois' goal of achieving a portfolio with three cash generating assets over the medium term, underpinned by a durable capital structure."

    h. In the Appendix 5B, JRV stated that it was "advancing engagement with third parties on strategic financing, initiatives, focussed on equity partnerships and

one or more of its core assets. Jervois continues to assess and negotiate terms with third parties, in conjunction with advisers.  The entity will update the market on the status of these transactions as required and in accordance with its continuous disclosure obligations."

(**Seventh Shareholder Value Representation**); and (**First Asset Partnering Representation** and **Equity Partnering Representation).**

95. On May 3, 2024, **187 million securities** were issued to the directors and management, including Bryce Crocker; Ken Klassen (General Counsel); James May (CFO), Sami Kalloninien (EGM Finland) and Matthew Legherich (EGM ICO) and Carlos Braga (EGM Brazil), following approval at the annual general meeting of shareholders for which notice was given on April 3, 2024 (**Long Term Incentives**).

96. Further, on May 3, 2024, the Chairman delivered an address (**2024 AGM Address**) to the shareholders, which supported the passing of the above resolutions including Management Incentives, and included the following statements (among others):

   a. *"However we do remain positive on the fundamental outlook for cobalt demand."*
   b. *"We have continued to act to preserve the value of our portfolio whilst looking to stabilising the company including its financial outlook. **These initiatives include asset level discussions with potential partners and active engagement with our lenders.**"*
   c. *"In the U.S., we continue to engage with the U.S. government on a number of fronts."*
   d. *"**We thank our existing and new shareholders for their ongoing support across a difficult 12 months.**"*
   e. *"In summary.*
      *- **We acknowledge this has been a difficult year for our shareholders.***
      *- **We also acknowledge the challenging cobalt market, however we retain a strong belief in the EV thematic.***
      *- **Prices are expected to rebound in the medium to longer term.***
      *- **We continue to advance a range of initiatives to strengthen the balance sheet.**"*
      ***I would also like to once again thank our Shareholders for your belief, and your patience.** We remain focussed on creating a global cobalt and nickel platform and*

17

> *delivering our near-term priorities across 2024. I hope you will continue to share*
> *the journey with Jervois." (**emphasis added**)*

(**Eighth Shareholder Value Representation**).

97. Further, during the AGM Address, the Chairman made the statement that "these initiatives include asset level discussions with potential partners and active engagement with our lenders." (**Second Asset Partnering Representation**).

98. This statement contained a material omission about the nature of the engagement with the lenders, namely that JRV knew that it would, or might, enter into a waiver of debt covenants on the Bonds less than one week later (**2024 AGM Omission**).

### D.10    MILLSTREET ADVANCES (MAY to AUGUST 2024)

99. Less than a week after the issue of the Long Term Incentives, without warning on **May 9, 2024**, a first waiver of Bonds was issued; noting that "JRV agreed with the majority bondholder [Millstreet] that being the holder of the ICO Bonds that the Holder will support a waiver of all financial covenants until 20 July 2024." (**First Waiver**).

100.    No statement was given that JRV was, or was approaching insolvency, or that it could not meet the covenants under the ICO Bonds.

101.    No explanation was given as to whether, and if so why, the waiver of covenants and forbearance was required; how it arose or the consideration for the waiver, stating that "other than the waiver, there are no changes proposed to terms of the ICO Bonds, including coupon, security or guarantee arrangements." (**First Millstreet Omission**).

102.    JRV also announced that it is "working in conjunction with its major lenders on potential transactions to strengthen Jervois' balance sheet". (**Ninth Shareholder Value Representation**).

103.    On **July 23, 2024,** JRV announced that Millstreet would support an "*extension* of the waiver granted on 9 May 2024 in respect of all financial covenants, originally granted until 20 July 2024 to 20 August 2024 and to agree a waiver of certain potential cross-defaults. The Holder has also agreed to support a deferral of the interest payment with respect to the ICO Bonds due on 20 July 2024 to 20 August 2024." (**Second Waiver**)

104.    No statement was given that JRV was, or was approaching insolvency, or that it could not meet the covenants under the ICO Bonds including the interest payment due on 20 July 2024.

105.        No explanation was given of the "potential" cross-defaults.  No explanation was given as to whether, and if so why, the waiver of covenants and forbearance was required; how it arose or the consideration for the waiver, stating that "other than the waiver, there are no changes proposed to terms of the ICO Bonds, including coupon, security or guarantee arrangements." (**Second Millstreet Omission**).

106.        JRV also repeated that it is "working in conjunction with its major lenders on potential transactions to strengthen Jervois' balance sheet". (**Tenth Shareholder Value Representation**).

107.        JRV announced that "*other than the Waiver and Deferral, Jervois has agreed to a certain event of default relating to the termination of a side letter with the Holder. Otherwise there are no changes proposed to the terms of the ICO Bonds, including coupon, security or guarantee arrangements*."   The nature or content of this side letter (**Side Letter**) was not provided and the reason for its termination was not disclosed  (**Third Millstreet Omission**).

108.        No shareholder approval for the side letter, or the termination thereof, was sought or obtained.

109.        Three days later, on **July 26, 2024,** Millstreet obtained rights to the debt under the secured working capital facility JFO provided by Mercuria Energy Trading SA.  The announcement noted that "[Millstreet] is now the Lender under the Facility; the Facility continues to be secured against the assets and working capital in Jervois Finland and the shares in Jervois Finland owned by Jervois. The Facility continues to have an unsecured parent guarantee from Jervois.  There are no changes to the terms of the Facility." (**Finland Transfer**)

110.        By virtue of the JFO Transfer,  accordingly, Millstreet obtained security over Jervois Finland.  No shareholder approval was sought or obtained.

111.        No explanation was given as to whether, and if so why, the transfer of the facility took place, and whether JRV consented to the transfer or was required to consent.  No explanation was given as to the consideration paid for the transfer. (**Third Millstreet Omission).**

112.        On **July 31, 2024**, JRV announced its quarterly activities report to 30 June 2024. It included statements that "*Jervois is engaging with [Millstreet] to agree a framework to ensure the Group has adequate liquidity until a holistic solution is agreed and implemented*." It was implied that this "holistic" solution would be in the best interests of the company, namely its shareholders (**Eleventh Shareholder Value Misprepresentation**).

113.    The announcement also stated that "engagement with lenders and third parties continued throughout the quarter, including due diligence across multiple Company assets. Jervois remains focussed on delivering a solution that provides additional liquidity, achieves a sustainable capital structure, and diversifies the Group's cash generation through transition from reliance on Jervois Finland as the sole operating asset, to a multi-operating asset portfolio over the medium term. " (**Twelfth Shareholder Value Representation**).

114.    JRV also noted that "restart of SMP remains paused while the Company is continuing to evaluate funding options with existing capital providers and third parties." JRV did not say that it was considering pledging the asset to Millstreet. (**Fourth Millstreet Omission**).

115.    On that date, JRV also announced that the "US Department of Defense" funded extensional drilling has returned positive indications of RAM resource growth potential.

116.    On **August 21, 2024**, JRV announced that Millstreet had agreed to a further waiver and forbearance of remedies until 30 August 2024; and to implement waivers of the financial covenants and collection account balances for the JFO Facility, including "potential cross-defaults". JRV indicated that the waiver was to "run concurrent with ongoing commercial discussions with the Holder." (**Third Waiver**)

117.    No statement was given that JRV was, or was approaching insolvency, or that it could not meet the covenants under the ICO Bonds or the JFO Facility. No explanation was given of the potential cross-default.

118.    No explanation was given as to whether, and if so why, the waiver was required. No explanation was given as to the consideration paid for the waiver. No indication was given as to the nature of the commercial negotiations (**Fifth Millstreet Omission).**

119.    JRV continued to repeat various shareholder value statements, including, with a change of emphasis, "Jervois is working in conjunction with its providers of *both debt and equity capital*, on potential transactions to strengthen its balance sheet." (**Thirteenth Shareholder Value Representation**).

120.    On **September 2, 2024** JRV announced a further waiver and interest deferral of the Bonds by Millstreet, and an extension of the waivers of the financial covenants and the collection amount for the JFO Facility, to run concurrently with the commercial discussions. (**Fourth Waiver**)

121.    No statement was given that JRV was, or was approaching insolvency, or that it could not meet the covenants under the ICO Bonds or the JFO Facility. No explanation was given of the potential cross-default.

122.    No explanation was given as to whether, and if so why, the waiver or extension was required.  No explanation was given as to the consideration paid for the waiver or extension.  No indication was given as to the nature of the commercial negotiations (**Sixth Millstreet Omission).**

123.    The Thirteenth Shareholder Value Representation was repeated (**Fourteenth Shareholder Value Representation**).

124.    On **September 9, 2024 JRV** announced that Millstreet and JRV had modified the JFO Facility, to increase the available headroom to Jervois.  The Lender agreed to provide an additional $7.5M delayed drawdown for general corporate and working capital purposes, which was incorporated into the JFO Facility, in return for the below consideration (**JFO Increase and Brazil Transfer**).

   a.  The loan was provided in return for an additional parent company guarantee by JRV extending to apply over the loan.

   b.  Millstreet received additional security for the JFO Facility, including a pledge over the shares of Jervois Brasil, which owns the SMP nickel cobalt refinery and a second lien on the assets currently secured by the ICO Bonds (**Second ICO Lien**).

125.    At this stage, Millstreet therefore had security over all key assets of JRV.

126.    There was a reference to the extension being until the later of **15 October 2024** "or such other date contemplated by a transaction support agreement in relation to a proposed recapitalisation, in circumstances where the Company and the Lender enter into such an agreement ("**Outside Date**")."  This is an indication that the RSA was already being negotiated by, at the latest, September 9, 2024.

127.    The explanation given as "*to support Jervois' continuing work with its debt and equity capital providers, and third parties, on potential transactions to strengthen its balance sheet.*" (**Fifteenth Shareholder Value Representation**).

128.    No statement was given that JRV was, or was approaching insolvency, or that it could not meet the covenants under the ICO Bonds or the JFO Facility.

129.    No explanation was given as to whether, and if so why, the extension was required.  No indication was given as to the nature of the commercial negotiations, other than a "proposed recapitalisation" (**Seventh Millstreet Omission**).

130.    On October 16, 2024, JRV announced a further waiver extension until 14 December 2024 or until the Outside Date.  (**Fifth Waiver**)

131.    JRV stated that the additional extensions "accompany ongoing negotiations across potential transactions to strengthen Jervois' balance sheet". (**Sixteenth Shareholder Value Representation**).

132.    No statement was given that JRV was, or was approaching insolvency, or that it could not meet the covenants under the ICO Bonds or the JFO Facility.

133.    No explanation was given as to whether, and if so why, the waiver was required. No indication was given as to the nature of the commercial negotiations, other than a "proposed recapitalisation" (**Eighth Millstreet Omission**).

134.    On **October 31, 2024,** JRV announced its quarterly activities report, indicating, among other things, that certain sales volumes were up from the previous quarter.  In the October 31, 2024 presentation, the statement was made that "Jervois continues to pursue a balance sheet restructuring transaction"; and there were references to potential "transactions to strengthen the balance sheet"; further it was stated that "all markets remain challenging with battery demand expected to improve in 2025". (**Seventeenth Shareholder Value Representation**).

135.    On **November 27, 2024**, JRV announced that it had secured from Millstreet a US$24.5 million increase in the limit for the delayed draw down term loan, and that the loan was extended to 31 March 2025 (**Millstreet Restructuring Loan**).  The Waivers outside date was further extended to 31 December 2025.  (**Sixth Waiver**).

136.    The Millstreet Restructuring Loan noted that "*US$8.0 million of the Term Loan limit increase is available to be drawn in accordance with Jervois' budgetary needs, including all parties restructuring costs, prior to 14 December 2024. A further US$16.5 million is available to be drawn thereafter, again in accordance with Jervois' budgetary needs including restructuring, and subject to certain milestones in relation to potential transactions to recapitalise Jervois' balance sheet. Due diligence and negotiations continue to advance in respect of these potential restructuring transactions*."  This is a clear reference to the ultimate transaction which transpired, being funded by Millstreet.

137.    At this stage, JRV did not say that it was pursuing transactions to strengthen its balance sheet, indicating that there were no alternative transactions on the table.  JRV did not announce that the other negotiations had ceased (**Ninth Millstreet Omission**).

138.    No details of the transactions were provided or disclosed at this stage (**Tenth Millstreet Omission**).

139.    On **December 16, 2024**, JRV announced that "the period in which Jervois shall meet certain milestones in relation to potential transactions to recapitalise Jervois' balance sheet has been extended from 14 December 2024 to 20 December 2024

(Australia). Negotiations continue to advance in respect of these potential restructuring transactions; and that the existing waivers announced on 27 November 2024 remain in place until December 31, 2024." (**First Restructuring Milestone Extension**)

140.    No details of the transactions or the milestones were provided or disclosed at this stage (**Eleventh Millstreet Omission**).

141.    On **December 23, 2024,** JRV announced that the period in which Jervois shall meet certain milestones in relation to potential transactions to recapitalise Jervois' balance sheet has been extended from 20 December 2024 to 31 December 2024 (Australia). Negotiations continue to advance in respect of these potential restructuring transactions; and that the existing waivers announced on 27 November 2024 remain in place until December 31, 2024. (**Second Restructuring Milestone Extension**)

142.    No details of the transactions or the milestones were provided or disclosed at this stage (**Twelfth Millstreet Omission**).


## D.11    ENTRY INTO THE RSA

143.    On January 2,  2025, the RSA was announced, proposing a recapitalisation including a full debt to equity conversion of the $100M ICO Bonds.   The proposed recapitalisation was said to *"strengthen the balance sheet"*.   (**Thirteenth Shareholder Value Representation**).

144.    The key benefit was said to be that the company would continue trading and continue; vendors, suppliers, customers and employees will remain unaffected.

145.    The RSA was not provided to the markets.

146.    On January 2, 2025, Crocker was reported in the Australian press as stating that "the Board had no other choice."

147.    Other articles stated that "the 2021 bond deal hoovered up 84% of the securities" and that "6824 shareholders were wiped out".

148.    The announcement to the stock exchange (**RSA Announcement**) stated that:

   a.    There would be no return for the current equity holders.

   b.    Prepackaged Chapter 11 procedure would ensue; which would be completed by 30 April 2025.

   c.    JRV is expected to continue operations in the usual course throughout the Chapter 11 bankruptcy process.

   d.    JV "*anticipates that its vendors, suppliers, customers and employees will remain unaffected by the proposed recapitalisation.*"

e.  Millstreet's intended Australian deed of company arrangement proposal will be consistent with the recapitalisation plan under Chapter 11, which requires JRV to dispose of its material assets to a nominee of Millstreet, conditional on creditor approvals required under the Corporations Act.

f.  As an implementation condition, JRV would seek ASX approval of its delisting.

g.  Under the Restructuring Agreement, Millstreet will provide $145 of pre and post-recapitalisation new equity capital to recapitalise the Jervois group business, including a US$70million equity commitment to underpin the SMP nick cobalt refinery restart.

h.  JRV will transfer the subsidiaries that operate the JFO, SMP, and ICO assets and the convertible notes to a reorganised parent entity and the ICO Bonds and convertible notes shall be converted into new equity interests in the reorganised parent entity.

i.  The reorganised parent intends to operate all of its subsidiaries with no interruptions to business, continuing to service its customers.  This includes JFO where the Lender (Millstreet) intends to continue the existing US$150M facility for the groups' working capital requirements under amended terms.

j.  "*Jervois has undertaken Jervois has undertaken significant diligence and negotiations with third parties, stakeholders and Millstreat in relation to the proposed recapitalisation of the Company's balance sheet extending to potential partnership including joint ventures, sale of its assets and or injections of equity capital into either its assets or the Company. Due to several factors including the current cobalt price which is, in real terms, at all-time lows, these negotiations have not resulted in a transaction that allows Jervois to recapitalise its group balance sheet on terms more favourable than those provided in the RSA.* "

## D.12   US BANKRUPTCY PROCEEDING

**Summary**

149.     On 14 January 2025, without an announcement to this effect, Jervois Texas LLC was incorporated.

150.     On 15 January 2025, JRV announced that: "The Australian Securities Exchange ("ASX") has confirmed to Jervois that ASX Listing Rules 11.1.2 and 11.2 regarding

24

circumstances requiring shareholder approval do not apply to the proposed recapitalisation."

151.    No further information was given, including regarding the basis on which this decision was made or what information was given to ASX.

152.    On **January 29, 2025** a US Chapter 11 bankruptcy was commenced in relation to all JRV Entities, including the Australian listed entity.  It was commenced in the name of Jervois Texas LLC.

153.    An announcement was made (**Bankruptcy Announcement**) which said that "JRV and certain of its affiliates  have commenced the prepackaged US Chapter 11 procedure as announced on January 2, 2025.  Shareholders will receive in hard copy a Combined Hearing Notice, a Non-Voting Status Notice and an Opt-Out Form which collectively notify recipients about the Chapter 11 Process.  Shareholders are encouraged to reach these documents and any other documents they may receive.  Further information can be found at https::/stretto.com/Jervois."

154.    Under the Chapter 11 bankruptcy, Millstreet is named as the largest creditor for $27,412,857.14 of unsecured notes (being the Convertible Notes).

155.    Two of the creditors names are redacted without explanation or permission of the Court.

**Subsidiaries in bankruptcy**

156.    A US Chapter 11 bankruptcy was commenced in relation to all JRV Entities, including the Australian listed entity.

157.    It was proposed by the debtors, namely the JRV Entities, lead by Jervois Texas.  All documents including the petitions were signed and submitted by Bryce Crocker.

158.    There are other Jervois entities which are not going through the bankruptcy proceedings; as they do not have debtors.[6]

159.    The  JRV Entities were debtors and were guarantors under the JFO Facility and the ICO Bonds.

160.    JRV was the borrower under the Convertible Notes.

161.    Jervois Suomi Holding OY and Jervois Finland OY were borrowers under the JFO Facility; and also pledged accounts and receivables.

162.    Jervois Japan Inc pledged receivables.

---

[6] Case 25-90002 Document 16 Filed in TXSB on 01/29/25 page 2.

163.    JRV, Jervois Mining USA Limited and Jervois Americas LLC pledged all asset security.

164.    Formation Holdings US, Inc pledged inter-company loans.

165.    The bankruptcy docket contains (1) the Restructure Plan; and (2) the Recapitalisation Agreement now known as the Amended and Restated Restructuring Support Agreement (**ARRSA**).[7] Under the Chapter 11 bankruptcy, Millstreet is named as the largest creditor for $27M of unsecured notes credits (likely the convertible notes). Note: two of the creditors names are redacted. Umicore, from whom JRV was obtaining cobalt, is also a significant creditor at $547M.

166.    The US bankruptcy proceeding contains a pre-packaged plan which Millstreet has already approved, filed as a voluntary petition.

167.    The proceeding which was first filed (25-90002) was all consolidated into the second proceeding; in the name of Jervois LLP (25-90003).

**Restructure Plan**

168.    The following has already been provided for in the Restructure Plan:

    a.    pre-recapitalisation support was provided in the order of $49M (**DIP Loan**) which is paid out first in the bankruptcy proceeding (note this was provided by Millstreet)l in addition Millstreet receives an equity kicker for this in the new entity (see Exhibit B of the Disclosure Statement, being the Restructuring Support Agreement, Annexure E);

    b.    the ICO Bonds are allowed in the bankruptcy in full and converted into 39.7% equity in the new entity in the name of Millstreet;

    c.    there is an intermediate holding company;

    d.    the new company will be formed in a jurisdiction agreed later;

    e.    new capital will be issued immediately (clause 17; page 34 and 35);

    f.    additional post-recapitalisation capital will be provided by Millstreet in return for 51.1% of the new entity, to be used for the following:

        i.    repayment of the DIP Loan;

        ii.    transaction fees;

        iii.    $12,500,000 in relation to the JFO Revolver Facility;

---

[7] Case 25-90002 Document 16-2 Filed in TXSB on 01/28/2025 pages 1-70. Note: there is an error in the Restructure Plan which states that this agreement is provided as Exhibit A when in fact it is Exhibit B.

iv.    creditors under the pre-packaged plan and DOCA (see further below).

169.    After the RSA Announcement on 2 January 2025, the RSA was amended on 28 January 2025 ARRSA).

170.    The ARRSA provides for the implementation of the Restructure Plan.  It contains a plan for the Australian deed of company arrangement, to be completed by 30 April 2025.

**Impact of the Restructure Plan**

171.    (**Equity Interests**) The Restructure Plan contains the following attempt to extinguish the rights of the JRV shareholders:

Class 9 – Existing Equity Interests

(a) *Classification*: Class 9 consists of all Existing Equity Interests.

(b) *Treatment*: On the Effective Date, all Existing Equity Interests shall be discharged, canceled, released, and extinguished and will be of no further force or effect.

(c) *Voting*: Class 9 is conclusively deemed to have rejected the Prepackaged Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject the Prepackaged Plan.

172.    The clear intention of the Restructure Plan is that all equity holder rights of JRV are extinguished.  Equity holders are not entitled to vote and are deemed to reject the plan.

173.    (**Reorganised Parent**) The structure of the equity in the new vehicle is held (by Millstreet) at the effective date:

| 51.1% | New equity in return for capital injection |
|-------|---------------------------------------------|
| 39.7% | Equity in return for ICO bonds |
| 4.3% | Equity kicker on the new equity commitment |
| 2.4% | Equity kicker in return for cancellation of convertible notes |

| 1.4% | Equity kicker on DIP Loan |
| 1.1% | Equity kicker on the exit commitment |

174.    In addition, after the effective date, there is a management incentive plan equivalent to 10% of the shares in the new vehicle (see further below).

175.    (**New Management Roles**) Exhibit G provides that the following will receive roles on the same terms and conditions.  This is the entirety of the existing executive committee and management team: Carlos Braga; Alicia Brown; Bryce Croker; Alwyn Davey; Jennifer Hinton; Sami Kallioinen; Ken Klassen; Matthew Lengherich; Louis Martin; James May Craig Morrision; Karen Walsh (not on the current executive team); and Wayde Yeoman.

176.    (**Fees**) It also provided for the payment of professional fees and transaction expenses in relation to the Restructure Plan (see Article II).

177.    (**New Equity Interests**) The offering, issuance and distribution of "New Equity Interests" by the "Reorganised Parent" was authorised without the need for further corporate action or without any further action by the "Holders of Claims or Interests") (see Article IV, H).

178.    (**Reorganised Parent**) On the "Effective Date, the Reorganised Parent (i) shall emerge from these Chapter 11 Cases as a private company and the New Equity Interests shall not be listed on a public stock exchange; and (ii) shall not be voluntarily subjected to any reporting requirements promulgated by the SEC, ASIC or ASX as applicable" (see Article IV, H).

179.    (**Australian Proceeding**) The Agreement further provided that "each of the Australian Entities (including JRV and 5 other entities) and /or their respective boards of directors shall commence the Australian Proceedings (being a voluntary administration in Australia) to be commenced by the board of directors of the Australian Entities by which the VA Administrator shall be appointed to implement a DOCA in respect of the Australian Entities".  The "VA Administrator" means "the appropriately qualified administrator acceptable to the Plan Sponsor to be appointed in the Australian Proceedings."  "DOCA" means "the deed of company arrangement…which shall be consistent with the Prepacked Plan and the Restructuring Support Agreement, which shall be implemented in respect of the Australian Entities pursuant to the Australian Proceedings (see Article IV, J).

180.     The so-called "Australian Proceeding" is not a proceeding at all; it is an agreement to voluntarily administer JRV.  It does not contain any involvement of an Australian Court in the process.

181.     (**Management Incentive Plan**) The Agreement further provided that "following the Effective Date, the Reorganised Parent shall implement a management incentive plan that shall include a pool of New Equity Interests in an amount equal to 10% of the New Equity Interests issued by the Reorganised Parent outstanding as of the Effective Date, which the form of awards, strike, metrics, vesting and other terms and conditions to be determined by the New Board (the MIP), provided that the MIP will be subject to anti-dilution protections with respect to any equity issued in connection with the $55 million new money investment referenced in Article IV.1 hereof".  (**New Management Incentive Plan**).

182.     (**New Organizational Documents**)  "On or immediately prior to the Effective Date, the New Organizational Documents shall automatically be deemed to have been adopted by the applicable Reorganized Debtors and become effective". (Article IV, N).

183.     (**New Boards**) "As of the Effective Date and subject to the Australian Proceedings....the terms of the current members of the boards of directors and similar governing bodies of the Debtors shall expire and each such member shall be deemed to have resigned, and the members of the New Boards and new officers of each of the Reorganised Debtors shall be deemed to have been appointed." (Article IV, I).  (**New Boards**)

184.     (**Indemnification Obligations**) Indemnification obligations of the directors and others shall be reinstated and shall survive on the same terms (Article IV, R).

185.     (**Employment Agreements**)"On the Effective Date, the Reorganized Debtors will assume the existing employment and consulting agreements with current members of the senior management team of the Debtors (listed on Exhibit G to the Restructuring Support Agreement), consistent with their current economic terms, as such agreements are otherwise conformed and amended on terms applicable to the Plan Sponsor and the applicable employee" (Article IV, S).  (**New Roles**)

186.     (**Releases**) There is an attempted release of "each Released Party" from any "Claims or Causes of Action, directly or derivatively including derivative claims asserted by or on behalf of any of the Debtors (including each of the JRV Entities) and "Releasing Parties" which attempts to include "(m) all Holders of Claims or Interests that vote to reject the Prepackaged Plan or are deemed to reject the Prepackaged Plan and who do not affirmatively opt out of the releases provided by the Prepackaged Plan", provided

that "in each case an Entity shall not be a Releasing Party if it (x) elects to opt out of the Third-Party Release or (y) timely objects to the Third-Party Release through a formal objection Filed on the docket of the Chapter 11 Cases that is not resolved before Confirmation." (Article VIII, C).  The attempt to release parties includes "(a) each Debtor; (b) each Reorganized Debtor; various lenders; (j) Millstreet in all capacities; (k) each current and former Affiliate of each Entity in clause (a) through to (l); (l) each Related Party of each Entity."

187.      (**Injunction**) There is an attempt to injunct the ability of parties to bring claims.

**Amended and Restated Restructuring Support Agreement**

188.      The ARRSA provided consent of JRV and all of its subsidiaries, and of the lenders, to implement the Restructure Plan.

189.      Clause 7.03 provides that the board of directors of JRV shall commence the Australian Proceeding to implement the DOCA;  and that Millstreet may appoint a receiver.

190.      The ARRSA was signed by Bryce Crocker on behalf of JRV and all of the JRV Entities and other subsidiaries and was counter-signed by Alwyn Davey where a second signature was required.

**Subsequent Events**

191.      On February 28, 2025, the Trustee in Bankruptcy and the Plaintiffs filed an objection in the Bankruptcy Court.[8]

192.      The hearing of the Texas bankruptcy Court was heard on March 6, 2025.

193.      On March 7, 2025 JRV announced that it had received two notices "purportedly" given under section 249D of the Corporations Act 2001 (Cth) by shareholders holding at least 5% of the votes that may be cast at a General Meeting of the Company; requesting that a General Meeting be called to consider, and if thought fit, pass the resolutions, including:

　　a.　That shareholders give advisory opinions in general meeting;

　　b.　removing the Directors Bryce Crocker, Peter Johnson and Brian Kennedy; and

[8] Case 25-90002 Document 127; Filed in TXSB 1-8.

c.   and   the   following   resolutions   regarding   the   Chapter   11:

Resolution 2 - Ordinary resolution on the Recapitalisation Proposal announced
2 January 2025

With regard to the proposal (Recapitalisation Proposal ) set out in the
Company's announcement dated 2 January 2025 titled 'Jervois Global signs
recapitalisation agreement', the Shareholders:

(a) (b) do not approve of the Recapitalisation Proposal;

request that the Company and its related entities (including, but not limited to,
Jervois Texas, LLC), to the fullest extent lawfully possible, immediately cease
all acts undertaken for the purpose of giving effect to the Recapitalisation
Proposal;

(c) request that the Company and its related entities (including, but not limited
to, Jervois Texas, LLC), to the fullest extent lawfully possible:

(i) withdraw the "Joint Prepackaged Chapter 11 Plan of Reorganization of
Jervois Texas, LLC and its Debtor Affiliates" (the Plan ) filed by Jervois Texas,
LLC in the United States Bankruptcy Court for the Southern District of Texas
on about 28 January 2025;

(ii) otherwise take steps to oppose the United States Bankruptcy Court for the
Southern District of Texas granting approval of the Plan; and

(d) request that the Board immediately develop and implement an alternative
strategy which does not involve the Shareholders losing the value of their
investment in the Company."

(**Notices**).

194.     The announcement states that "the Company is considering if the notices are
valid and the directors will comply with their obligations under the Corporations Act.
The Company will update shareholders on any material developments."

195.     On March 10, 2025, JRV announced that Jervois Global Limited advised that
confirmation orders have now been entered in the Group's Chapter 11 recapitalisation
procedure and that the Group continues to work with its secured creditors to satisfy
conditions to the Chapter 11.

196.     On March 12, 2025 KPMG announced that they had been appointed as
voluntary administrators subject to the Confirmation Order; that the Chapter 11 Plan
includes that Millstreet plans to submit a Deed of Company Arrangement; that the

31

immediate focus is ensuring continuity of the underlying operations of the company; and that operations of other subsidiaries which are not subject to voluntary administration are expected to continue in the normal course and remain unaffected by the appointment of the administrators (including Finland, Brazil and the US).

197.      The announcement by KPMG states that the Administrators are aware of the directors having received the Notices and that it notes that the Company's directors' powers are suspended and that they do not have power to convene a general meeting. The announcement notes further that the Administrators do not propose to convene a general meetings and will proceed to discharge their statutory duties in accordance with the Corporations Act.

**Texas Bankruptcy Orders**

198.      The Orders dated March 6, 2025 were made in the form of a pre-packaged judgement written by or on behalf of the Debtors.

199.      The Orders were made in Houston, Texas.

200.      The Debtors address for service is disclosed, in the Orders, as Cremorne, Victoria.

201.      The Orders are subject to appeal by the Plaintiffs in this proceeding, on the basis that they are oppressive, contain errors of law and fact, and are the result of various abuses of the discretion of the Bankruptcy Court.

202.      The Orders contained several assertions that the Orders, and the Prepackaged Plan, were in the best interests of the holders of various interests, including the shareholders.  There can be no reasonable basis on which the Debtors, or the Bankruptcy Court, could assert that the Prepackaged Plan was in any way in the interests of the shareholders of JRV, including the Plaintiffs and the Class.

203.      By the terms of the Prepackaged Plan, Bryce Croker (and potentially other directors) and Millstreet will be enriched by the Bankruptcy Court's acceptance of the Prepackaged Plan at the expense of the shareholders, who did not negotiate, were not on notice of, and could not participate in the reorganisation of capital.

204.      The Orders note that "the Debtor's directors and officers spent countless hours on the structuring process, driving the Debtors' transition into chapter 11". They did so without disclosing these negotiations to the public, to their shareholders, and without giving the shareholders an opportunity to approve the transaction, or to participate in it, for example by providing capital to avoid dilution.

## D.14   TRANSACTIONS

205.      JRV and its the Board did not request, or obtain, approval from the shareholders for any of the following:

    a.   The entry into the Bonds (5 July 2021) (**Initial Bond Transaction**);

    b.   Any of the First Waiver, Second Waivers, Third Waiver, Fourth Waiver or Fifth Waiver (**Waivers**);

    c.   The agreement to transfer the JFO Facility to Millstreet , Finland Transfer;

    d.   The agreement to take further capital from Millstreet and pledge the SMP Asset, the **Brazil Transfer;**

    e.   The agreement to enter into the **Second ICO Lien**;

    f.   The agreement for a loan for purposes including the restructuring of JRV, the **Millstreet Restructuring Loan**;

    g.   The agreements, formal or informal, to enter into a plan for a restructuring, including "milestones", which was not disclosed to the market (**Milestones Agreement**);

    h.   The agreement to enter into the "Side Letter" between JRV and Millstreet, referred to in the announcement dated July 23, 2024; which side letter (or its contents) have never been disclosed, or to terminate the Side Letter;

    i.   The agreements for extensions of milestones in accordance with the restructuring, namely the First Restructuring Milestone Extension or the Second Restructuring Milestone Extension;

    j.   The Recapitalisation Agreement, the **RSA**; or

    k.   The Amended and Restated Restructuring Agreement, the **ARRSA** ; and/or

    l.   The decision to put the Company into US Chapter 11 bankruptcy proceedings (**Chapter 11**),

(**Transactions**).

## E.      COUNT I:      BREACH OF SECURITIES LAWS AND MISREPRESENTATIONS

**Plaintiffs repeats all allegations** contained in the preceding paragraphs as if fully set forth herein through Count I and its associated subsections.

## E.1     MISREPRESENTATION 1  - COBALT PRICING

206.       The Initial Bond Transaction was justified by JRV on the basis that it was to preserve commercial flexibility and to avoid the need to enter into external offtake agreements at depressed prices/historical lows.

207.       This was false and misleading because offtake agreements around that time were entered into as part of the Initial Bond Transactions (it was a condition that the SMP Cobalt Offake agreement was executed).

208.       The Transactions were justified throughout on the basis that cobalt prices were at historical lows.

209.       Cobalt was at an all time high during some or all of the periods where this justification was relied upon.

210.       The First Historically Low Prices Representation; and/or the Second Historically Low Prices Representation; and/or the Third Historically Low Prices Representation were false and misleading.

211.       The true justification or purpose for the Initial Bond Transactions, and each of the subsequent Transactions became clear when the misrepresentations were revealed and the stockmarket were corrected on:

   a.  September 9, 2024, *further or alternatively*,
   b.  November 27, 2024, *further or alternatively*,
   c.  December 16, 2024, *further or alternatively*,
   d.  December 23, 2024, *further or alternatively*;
   e.  January 2, 2025, *further or alternatively*;
   f.  January 28, 2025.

212.       The First Historically Low Prices Representation; and/or the Second Historically Low Prices Representation; and/or the Third Historically Low Prices Representation themselves have never been corrected by JRV or the Directors.

## E.2    MISREPRESENTATION  2 -  IN THE INTERESTS OF SHAREHOLDERS

213.       At various times throughout the Transactions, it was stated that the purpose of the Transactions was to strengthen the balance sheet or otherwise to benefit the shareholders.  The statements were regularly repeated and relied on by the Class.

214.       The First Shareholder Value Representation and/or Second Shareholder Value Representation and/or Third Shareholder Value Representation and/or Fourth Shareholder Value Representation and/or Fifth Shareholder Value Representation

and/or Sixth Shareholder Value Representation and/or Seventh Shareholder Value Representation and/or Eighth Shareholder Value Representation and/or Ninth Shareholder Value Representation and/or Tenth Shareholder Value Representation and/or Eleventh Shareholder Value Representation and/or Twelfth Shareholder Value Representation contained an express or implied representation that the reason the balance sheet was being strengthened, or the reason for entry into the Transactions, was for the shareholders.

215.     The statements were designed to encourage the shareholders to continue to invest in JRV at a time when negative news was being conveyed on the stock exchange.

216.     The extinguishment of shareholder equity following the Transactions to which these Misrepresentations related means that these statements were misleading at the time of making them.

217.     Further, the  2 January 2025 Announcement stated in the Thirteenth Shareholder Value Representation that the purpose of the RSA was to strengthen the balance sheet.   At this point, it was clear that Transaction was NOT in the interests of shareholders.   Accordingly, at this time "the truth came out", in that JRV aligned its disclosures regarding the "balance sheet" to its real purpose.  The "*strengthening of the balance sheet*" in question was designed to enrich the Directors and Millstreet, not to support the shareholders.

218.     Subject to information and belief, and to discovery, some or all of JRV or the Directors knew or ought to have known:

   a.   in July 2021 when they entered into the Initial Bond Transaction; *further or alternatively*

   b.   at the time of entering into the First Waiver, and/or the Second Waiver Any of the First Waiver, Second Waivers, Third Waiver, Fourth Waiver or Fifth Waiver (**Waivers**); *further or alternatively*

   c.   at the time of entering into the agreement to transfer the JFO Facility to Millstreet , Finland Transfer; *further or alternatively*

   d.   at the time of entering into the agreement to take further capital from Millstreet and pledge the SMP Asset, the **Brazil Transfer;**  *further or alternatively*

   e.   at the time of entering into the agreement for a loan for purposes including the restructuring of JRV, the **Millstreet Restructuring Loan**; *further or alternatively*

   f.   at the time of entering into the agreements, formal or informal, to enter into a plan for a restructuring, including "milestones", which was not disclosed to the market (**Milestones Agreement**); *further or alternatively*

g.  at the time of entering into the agreement to enter into the "side letter" between JRV and Millstreet, referred to in the announcement dated July 23, 2024; which side letter (or its contents) have never been disclosed (**Side Letter**), or to terminate the Side Letter; *further or alternatively*

h.  at the time of entering into the agreement for extensions of milestones in accordance with the restructuring, namely the First Restructuring Milestone Extension or the Second Restructuring Milestone Extension; *further or alternatively*

i.  at the time of entering into the Recapitalisation Agreement, the **RSA**; or

j.  at the time of entering into the Amended and Restated Restructuring Agreement, the **ARRSA** ; and/or

k.  at the time of entry into US Chapter 11 bankruptcy proceedings (**Chapter 11**),

that there was a possibility that the shareholders' equity in the JRV's main undertaking may be extinguished.

219.    This was not disclosed clearly or at all.

220.    Accordingly, reliance losses from that time apply (to be determined following expert evidence).

## E.3    MISREPRESENTATION 4 - MATERIAL OMISSIONS IN RELATION TO THE TRANSACTIONS

221.    No satisfactory explanation was given in relation to the Waivers as to enable the shareholders to assess:

a.  why a waiver or forbearance or extension was required;

b.  how each relevant Transactions arose;

c.  The consideration for the First Waiver; the Second Waiver; the Third Waiver; the Fourth Waiver; the Fifth  Waiver; the Sixth Waiver

d.  The consideration for the Finland Transfer;

e.  The commercial rationale for the proposed recapitalisation in the JFO Increase and Brazil Transfer;

f.  The consideration or rationale for the First Restructuring Milestone Extension or the Second Restructuring Milestone Extension.

222.        Each of the First Millstreet Omission, the Second Millstreet Omission, the Third Millstreet Omission; the Fifth Millstreet Omission; and the Sixth Millstreet Omission; the Seventh Millstreet Omission; the Eighth Millstreet Omission were false and misleading.

223.        The Fourth Millstreet Omission was misleading because JRV did not say that it was considering pledging the asset to Millstreet.

224.        The Ninth Millstreet Omission was misleading because JRV did not announce that the other negotiations had ceased and the Tenth Millstreet Omission and the Eleventh Millstreet Omission were misleading because no details of the transactions were provided or announced, even though there had been an agreement of some form in relation to the milestones, the Milestone Agreement.

225.        Some but not all of the omissions were corrected in the Chapter 11 Bankruptcy, as it became clear that the purpose was to facilitate the Scheme.

## E.4    MISREPRESENTATION 4 - OMISSIONS IN RELATION TO THE US BANKRUPTCY

226.        The RSA Announcement and subsequent Bankruptcy Announcement were misleading by omission.

227.        The RSA Announcement, and the subsequent Bankruptcy Announcement, excluded significant information which would have brought shareholders up to date earlier.  Both were misleading by material omission.  The RSA Announcement did not say that:

   a.  Bankruptcy would be sought in relation to all JRV Entities; that there are 8 entities including JRV which have been subject to a US bankruptcy proceeding in order to extinguish all of the rights of shareholders.

   b.  The JRV head entity will be put into a US bankruptcy, as opposed to simply the US subsidiaries.

   c.  A special purpose vehicle would be incorporated for the purpose of the bankruptcy; Jervois Texas LLC; and that the bankruptcy proceeding would be conducted in Houston.

   d.  The intention was that the shareholders' equity would be extinguished by the US proceeding and the shares in the new entity will be immediately issued and that shareholders would be deemed to have released all claims.

   e.  Management would be issued equity and would receive roles in the new organisation.

     f.    Millstreet would hold 90% of the capital in the new organisation and that management would hold the other 10%,

       (**RSA Misrepresenations**).

228.      The RSA Announcement states that the shareholders "are not expected to receive a return". This is false and misleading because the *US bankruptcy documents make it clear that the equity will be extinguished.*

229.      The intention of these omissions is to ensure that shareholders did not understand the true nature of the action that was being taken in the United States and that by the time they do, the bankruptcy and the Orders will be complete and they will have no ability to recover their assets or their equity in JRV.

## E.5    MISREPRESENTATION 5 - AGM 2024 OMISSIONS

230.      On 30 April 2024, it was announced to the market that there were cost reductions including in management salaries and also that "no short term incentive awards would be made."

231.      However, at the same time, long term share incentives were placed.

232.      On 3 May 2024, Long Term Incentives were awarded.

233.      This was approximately 1 percent of the capital of the company (to be confirmed).

234.      The 2024 AGM announcement included these details. However, the 30 April 2024 announcement was misleading by omission. It did not explain that Long Term Incentives were intended to be awarded.

235.      Further, the 2024 AGM Announcement contained a 2024 AGM Omission. At the time of the AGM, JRV knew that it would, or might, enter into a waiver of the debt covenants on the Bonds less than one week later. It did not bring the shareholders up to date when voting on the resolutions  The record was corrected 6 days later, on May 9, 2024.

## E.6    MISREPRESENTATION 6 -  NEGOTIATIONS REGARDING ASSET PARTNERSHIPS EQUITY PARTNERSHIPS

236.      In the First Asset Partnering Representation and the Second Asset Partnering Representation, JRV stated that the discussions were at the asset level only.

237.    In the Quarterly Activities Report for the quarter ended 31 March 2024, released on 30 April 2024, the Company represented that they were focussed on strategic financing initiatives, focussed on "equity partnerships".

238.    At the time of entry into the First and Second Asset Partnering Representation and the 2024 AGM Omission, JRV did not give an indication of negotiations in relation to debt; that JRVwas approaching a structure with its debt partners that would be agreed and "prepackaged". Clearly a version of this outcome must have been reasonably foreseeable to the directors on or about the time of 30 April 2024, given that the first waiver was entered into on 9 May 2024 and equity was issued on 3 May 2024.

### E.7    VIOLATIONS OF SECURITIES LAWS

239.    Members of the Class purchased, or continued to hold, securities in JRV at artificially inflated prices due to the one or more of the misrepresentations or material omissions set out in sections E.1 to E.6 above (together the **Misrepresentations**).

240.    Some or all of the Misrepresentations were material to investors and had the effect of artificially inflating JRV's stock price at various times.

241.    Some or all of the Class suffered economic losses upon discovery of the truth, and/or upon the extinguishment of their capital, which Transactions were, in whole or in part, founded upon misleading statements to the market.

242.    JRV issued and *further or alternatively* the Defendant Bryce Crocker was responsible for issuing materially false and misleading statements during the Class Period.

243.    *Further or alternatively, s*ubject to discovery, some or all of the other Directors were responsible for approving materially false and misleading statements during the Class Period.

### COUNT I.1: VIOLATIONS OF SECTION 10(B) OF THE SECURITIES EXCHANGE ACT AND RULE 10B-5 (15 U.S.C. § 78J(B) AND 17 C.F.R. § 240.10B-5)

244.    On the basis of information and belief and subject to discovery, some or all of the Directors acted with scienter in that they knowingly or recklessly engaged (or at least if they did not, then negligently) engaged in conduct that deceived investors and (subject to discovery), were aware, or recklessly disregarded or, at least ought to have

known, that one or more of the Misrepresentations were materially false and misleading.

245.        Further, there were patterns of repeated Misrepresentations that were not corrected.  Some of these repeated misrepresentations persisted for some time,  until, for example on January 2, 2025, the Directors intentionally tried to recast the statement regarding strengthening the balance sheet in a new light.

246.        On the basis of information and belief and subject to discovery, some or all of the Directors, directly and indirectly, by the use of means or instrumentalities of interstate commerce, engaged in acts, practices, and courses of business that operated as a fraud and deceit upon investors in violation of Section 10(b) of the Exchange Act and Rule 10b-5.

247.        As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs suffered damages.

**Claim for Relief**

248.        The Plaintiffs claim:

    a.  compensatory damages in an amount to be determined at trial.

    b.  for all other relief that the Court considers equitable.

**COUNT I.2: VIOLATIONS OF SECTION 20(A) OF THE EXCHANGE ACT (15 U.S.C. § 78T(A))**

249.        The Directors, as controlling persons of JRV, are liable under Section 20(a) for the wrongful conduct committed by JRV.

250.        As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs suffered damages.

**Claim for Relief**

251.        The Plaintiffs claim:

    a.  compensatory damages in an amount to be determined at trial.

    b.  for all other relief that the Court considers equitable.

**COUNT I.3:   VIOLATIONS OF THE AUSTRALIAN CORPORATIONS ACT 2001 (CTH) - SECTIONS 1041H AND/OR VIOLATIONS OF SECTION 674 OF THE CORPORATIONS ACT 2001 (CTH) – BREACH OF CONTINUOUS DISCLOSURE OBLIGATIONS**

252.     The Plaintiffs repeat and reallege each allegation contained in the preceding paragraphs E.1 to E.6

253.     *Further or alternatively*, JRV and/or some or all of the Directors violated Australian securities laws by making false and misleading statements by way of one or more of the Misrepresentations in connection with the trading of financial products, contrary to Sections 1041H (misleading or deceptive conduct) of the *Corporations Act 2001 (Cth)*.

254.     *Further or alternatively*, at all relevant times, JRV was a disclosing entity subject to the continuous disclosure obligations of Section 674 of the Corporations Act 2001 (Cth) and the ASX Listing Rules, including Listing Rule 3.1, which requires that a listed company immediately disclose to the ASX any information that a reasonable person would expect to have a material effect on the price or value of its securities.

255.     During the Class Period, JRV or some or all of the Directors made one or more of the Misrepresentations including material omissions.

256.     As a result of the JRV's and/or Directors' Misrepresentations and/or failure to disclose material price-sensitive information, Plaintiffs and other members of the Class:

a.   purchased or acquired JRV securities at artificially inflated prices, believing the market was fully informed;

b.   were misled by the absence of material disclosures that a reasonable investor would have relied upon in making investment decisions; and

c.   suffered losses when the truth was finally disclosed, causing the market price of JRV securities to decline significantly at various times; and finally, when the shares of JRV were extinguished by way of Chapter 11.

257.     JRV's and/or Directors' failure to disclose material information constitutes a breach of Section 674 of the *Corporations Act 2001* (Cth), entitling Plaintiffs and the Class to relief under:

a.   section 1325 of the *Corporations Act*, which allows an affected party to seek compensation and injunctive relief for contraventions of continuous disclosure obligations;

b.   section 1041I of the *Corporations Act*, which permits investors to recover damages for misleading or deceptive conduct relating to financial products and services.

258.     As a direct and proximate result of JRV's and/or Directors' Misrepresentations and material omissions, Plaintiffs and members of the Class have suffered significant

economic harm, including the loss of investment value and damages in an amount to be determined at trial.

**Claim for Relief**

259.    The Plaintiffs claim:

    a.  compensatory damages in an amount to be determined at trial.

    b.  for all other relief that the Court considers equitable.

## COUNT I.4: VIOLATIONS OF CANADIAN SECURITIES LAWS - ONTARIO SECURITIES ACT, SECTION 126.2

260.    The Plaintiffs repeat and reallege each allegation contained in the preceding paragraphs E.1 to E.6.

261.    *Further or alternatively*, JRV and/or some or all of the Directors violated Canadian securities laws, including Section 126.2 of the *Ontario Securities Act*, by making material misrepresentations that affected the market price of securities.

262.    At all relevant times, JRV was a "reporting issuer" under the Ontario Securities Act, R.S.O. 1990, c. S.5 (the "OSA") and was subject to its continuous disclosure and anti-fraud provisions, including Section 126.2.

263.    Section 126.2(1) of the OSA prohibits any person or company from making a misrepresentation in connection with:

    a.  the purchase or sale of securities;

    b.  the issuance or publication of any documents required to be filed under Ontario securities law; and

    c.  any statement or document that could reasonably influence investors.

264.    During the Class Period, JRV and/or some or all of the Directors made false and misleading statements and material omissions, in violation of Section 126.2, by making the Misrepresentations including material omissions, creating an artificial impression of JRV's financial position, thereby inflating its stock price.

265.    As result of the misrepresentations and omissions, Plaintiffs and the Class:

    a.  acquired or continued to hold securities of JRV at artificially inflated prices;

    b.  relied on the integrity of the public market and JRV's continuous disclosure obligations in making their investment decisions;

    c.  suffered financial losses when the true facts were disclosed causing a decline in the value of JRV's securities, and/or when the rights of shareholders were extinguished.

266.     JRV and/or some or all of the Directors are jointly and severally liable under Section 126.2(1) of the Ontario Securities Act.

267.     Plaintiffs seek damages in an amount to be determined at trial and/or rescission of transactions pursuant to Section 138.3 of the OSA for the Class.

**Claim for Relief**

268.     The Plaintiffs claim:
   a.   compensatory damages in an amount to be determined at trial.
   b.   for all other relief that the Court considers equitable.

## F.     COUNT II:     THE SCHEME AND A CIVIL CONSPIRACY FOUNDED ON BREACH OF FIDUCIARY DUTY

**Plaintiffs repeats all allegations** contained in the preceding paragraphs as if fully set forth herein through Count II and its associated subsections.

269.     On the basis of information and belief, and subject to further findings during discovery, from on or about one or more of the following dates:
   a.   March 6, 2025 (being the date of the Orders); *further or alternatively*
   b.   January 28, 2025 (being the date of the ARRSA ); *further or alternatively*
   c.   January 2, 2025 (being the date of the RSA); *further or alternatively*
   d.   December 23, 2024 (being the date of the RSA); *further or alternatively*
   e.   December 16, 2024, (being the date of the Second Milestone Extension); *further or alternatively*
   f.   December 16, 2024, (being the date of the First Milestone Extension); *further or alternatively*
   g.   November 27, 2024 (being the date of the Millstreet November Loan Announcement, in which JRV disclosed a restructuring transaction and that Millstreet was covering the costs thereof); *further or alternatively*
   h.   October 31, 2024 (being the date of the quarterly activities report); *further or alternatively*
   i.   October 16, 2024 (being the date of the Fifth Waiver; *further or alternatively*
   j.   October 15, 2024 (being the first Outside Date); *further or alternatively*
   k.   September 9, 2024 (being the date of the JFO Increase and SMP Transfer); *further or alternatively*
   l.   September 2, 2024 (being the date of the Fourth Waiver); *further or alternatively*

m.  August 21, 2021 (being the date of the Third Waiver); *further or alternatively*

n.  July 31, 2024 (being the date where Millstreet was engaging with JRV to agree a "framework"); *further or alternatively*

o.  July 26, 2024  (being the date of the JFO Transfer); *further or alternatively*

p.  July 23, 2024  (being the date of the Second Waiver); *further or alternatively*

q.  May 9, 2024 (being the date of the First Waiver); *further or alternatively*

r.  May 3, 2024 (being the date of the 2024 AGM; *further or alternatively*

s.  April 3, 2024 (being the date of the quarterly activities report); f*urther or alternatively*

t.  April 3, 2024, (being the date of issue of the AGM notice for the 2024 AGM); *further or alternatively*

u.  March 7, 2024 (being the date of the Incentives Announcement);  f*urther or alternatively*

v.  September 1, 2023 (being the date of second subscription for the Convertible Notes raise); f*urther or alternatively*

w.  July 20, 2023 (being the date of the Convertible Notes raise); f*urther or alternatively*

x.  June 28, 2023 (being the date of the Convertible Notes Announcement); f*urther or alternatively*

y.  February 7, 2022 (being the date of the $50M bond drawdown);  f*urther or alternatively*

z.  July 27, 2021 (being the date that David Issroff was appointed as a director); f*urther or alternatively*

aa. July 22, 2021 (being the date the Bonds settled); f*urther or alternatively*

bb. July 5, 2021 (being the date of entry into the Initial Bond Transaction;

cc. another unknown date, being the date of entry into the Side Letter;

1.  some or all of the Directors, together with JRV and/or some or all of the JRV Entities;

2.  (on the basis of information and belief, and subject to further findings during discovery) intentionally, recklessly or negligently;

3.  entered into an agreement with Millstreet or its or their representatives, which was or may have been formal, informal, written, unwritten, oral, implied or by conduct and may have been executed or executory and may have been with or without conditions (**Agreement**);

4. (on the basis of information and belief, and subject to further findings during discovery) with a purpose, or *further or alternatively*, having the effect of, depriving the shareholders (including the Class and the Plaintiffs) of their interest in the equity of, or the underlying assets of, JRV, without their knowledge, participation or a proper opportunity to timely object or participate in the proceedings *further or alternatively*, because it culminated in an out of country court, *further or alternatively*, where the shareholders would have no recourse because there was an attempt to extinguish their equity and release all of the rights;

5. which was dependent on an underlying breach of the Directors' fiduciary duties to act in the best interests of shareholders, *further or alternatively*, in a manner which enriched some or all of them at the expense of the shareholders, *further or alternatively*, which was oppressive to shareholders, *further or alternatively*, on the basis of an uninformed stock market, *further or alternatively*, which was a conflict of interest where no shareholder approval was obtained (**Unlawful Conduct**);

6. by virtue of the entry into one or more of the Transactions,

   (the **Scheme**).

270.    On the basis of information and belief, and subject to further findings during discovery, Millstreet:

   a. (on the basis of information and belief, and subject to further findings during discovery) intentionally, recklessly or negligently;

   b. (on the basis of information and belief, and subject to further findings during discovery with a purpose, or further or alternatively, having the effect of, depriving the shareholders (including the Class and the Appellants) of their interest in the equity of or the underlying assets of JRV without knowledge, participation or a proper opportunity to timely object or participate in the proceedings *further or alternatively*, because it culminated in an out of country court, *further or alternatively*, where the shareholders would have no recourse because there was an attempt to extinguish their equity and release all of the rights;

   c. (on the basis of information and belief, and subject to further findings during discovery knowing of the Unlawful Conduct;

      d.   entered               into             the              Agreement,

and thereby knowingly participated in the Scheme.

271.      On the basis of information and belief, and subject to further findings during discovery, the Scheme constituted a civil conspiracy because:

    a.   there was an agreement between the parties for one or more of the Directors, or JRV, to engage in the Unlawful Conduct;

    b.   (on the basis of information and belief, and subject to further findings during discovery) some or all of the Defendants knowingly and intentionally participate in the Scheme;

    c.   the Scheme was based on an underlying unlawful conduct, including the Unlawful Conduct;

    d.   one or more of the Defendants, by entering into the Transactions, took overt actions to advance the Scheme; and

    e.   the Class and the Plaintiffs suffered damage as a result, losing all of their equity in JRV.

**Claim for Relief**

272.      The Plaintiffs claim:

    a.   compensatory damages in an amount to be determined at trial.

    b.   for all other relief that the Court considers equitable.

## G.    COUNT III:    FAILURE TO OBTAIN SHAREHOLDER APPROVAL

**Plaintiffs repeats all allegations** contained in the preceding paragraphs as if fully set forth herein through Count III and its associated subsections.

### G.1    COUNT III.1    ASX LISTING RULES

**ASX Waivers**

273.      JRV failed to obtain the requisite approval of the JRV shareholders pursuant to Australian law.

274.　　　A waiver was obtained in relation to the final decision to put JRV into Chapter 11. There is no indication that ASX was told the full information about the nature of the Circumstances of Oppression.  In any case, even if a waiver was obtained, the Chapter 11 was still oppressive to shareholders and shareholder approval should have been obtained.

275.　　　No waiver was from ASX in relation to the Initial Bond Transaction; the Waivers or the entry into the Finland Transfer; the Brazil Transfer;the RSA; or the ARRSA.

**Application of the Listing Rules**

276.　　　ASX Listing Rules require shareholder approval to be obtained in certain circumstances:

　　　a. Rule 11.1 requires a company to notify ASX and if ASX requires, obtain shareholder approval where it proposes to make a significant change, either directly or indirectly to the nature or scale of its activities.

　　　b. Rule 11.2 applies if the significant change involves the entity disposing of its main undertaking in which case the entity must get the approval of the shareholders and comply with any requirements of the ASX in relation to the notice of meeting.

277.　　　"Disposal" pursuant to the Listing Rules means to dispose of, directly or indirectly, through another person (including an individual, body corporate, body politic, firm, association, authority or other entity) *by any means* including:

　　　a. Granting, being granted or exercising an option;

　　　b. Declaring a trust over an asset;

　　　c. Using an asset as collateral;

　　　d. Decreasing an economic interest; or

　　　e. Disposing of part of an asset.

278.　　　The entry into the Transactions constituted a disposal pursuant  to the Listing Rules.

**Listing    Rule    11.1    -    Change    to    the    nature    or    scale    of    activities**

279.　　　Rule 11.1 applied to the entry into the Initial Bond Transaction.

280.　　　The nature of the covenants entered into in relation to the Bonds, including the general and financial undertakings and the tie up of the Group, did significantly change the nature of the way the Group was conducted.

47

281.    ASX should be notified if :

    a.    an entity is proposing to dispose of or to embark on a series of disposals that together will result in a disposal of its main undertaking;

    b.    to dispose of an existing business if it accounts for 25% or more of assets; equity interests; in the case of a pre-revenue resources company - 25% of consolidated annual expenditure; EBITDA or consolidated annual profit before tax.

282.    The Board failed to notify ASX and did not act in the interests of securityholders.  The stated objective was that the Initial Bond Transaction would "*preserve commercial flexibility by* not requiring the entry into offtake agreements".

283.    The Initial Bond Transaction (further or alternatively, some or all of the Transactions) in fact did regulate the activities of the Group and ultimately lead to the assets being removed from under the shareholders, by virtue of the Bankruptcy Order.

284.    ASX was not notified.

**Listing Rule 11.2 - Disposal of the Main Undertaking**

285.    The policy objective underlying Listing Rule 11.2 is that "a disposal by a listed entity of its main undertaking is such a transformative transaction, and results in such a major change to the nature of the security holders' investment in the entity, that in all cases it is appropriate for security holders to have to approve it."

286.    The Initial Bond Transaction, followed by the various Waivers,  Finland Transfer and Brazil Transfer pledging additional security, was a "disposal."

287.    Rule 11.2 did apply to the Initial Bond transaction, or *further or alternatively* as it progressed, to all Transactions as a whole,.

288.    The assets the subject of the Bond Transaction can be considered the "main undertaking" of the Company.

    a.    the company relied on the Cobalt operation in ICO (see the Presentation dated 27 July 2021; for an AGM held just after the Initial Bond Transaction);

    b.    it was a critical and initial part of the supply chain: see Investor Presentation (27 July 2021, 14): Integrated Value Chain: Step 1: Idaho Cobalt Operations (Cobalt Mining / Raw Materials) --> 2. Primary Refining / Cobalt Intermediates (Sao Miguel Paulista / Contractual rights to c. 40% refiner capacity through Kokkola, Finland refinery) --> 3. Freeport Cobalt (Finished Cobalt Advanced Materials (chemicals and powders); Pathway to become #2 producers of refined cobalt outside of China;

    c.   JRV acquired ICO in July 2019 which was partially constructed and more than US$120M had already been invested in the site;

    d.   the main operations of JRV comprised at that time getting the ICO ready for production, rather than the sale and supply of cobalt itself;

    e.   the company changed its name to reflect the fact that it was a vertically integrated cobalt producer and refiner; this was a key part of the supply chain;

    f.   the ICO was the only supplier in the USA;

    g.   the other assets were at different parts of the supply chain, in particular SMP was a downstream asset; without the cobalt offtake it was compromised;

    h.   at the time of the Initial Bond Transaction the only other asset was SMP; Freeport Cobalt (Finland) came after (see 27 July 2021 Presentation; page 10);

    i.   at that stage, SMP being the only other asset, was not operational;

    j.   JRV was pre-revenue and the transaction would account for more than 25% of the capital expenditure going forward;

    k.   if it was only a partial disposal of the main undertaking, the terms and conditions of the Bonds meant that the asset was effectively removed from the shareholders and JRV was subject to a series of constraints which meant that the asset holding was significantly different.

289.      In any case, the cumulative effect of *all of the Transactions* was that the entity did dispose of its main undertaking.

290.      Accordingly, shareholder approval should have been obtained once the further assets were being subjected to further security Transactions, even if the Initial Bond Transaction was not.

291.      Further, the Directors ought to have known, or realised, that by entering into the Initial Bond Transaction; followed by the various Waivers or extensions in which additional security was granted; that the main undertaking was being disposed of without shareholder approval as a result of the Transactions (or some or all of them).

292.      The failure to obtain shareholder approval for the Initial Bond Transaction, *further or alternatively* for some or all of the resultant Transactions, was in breach of the ASX Listing Rules as it constituted a disposal of the main undertaking.

**Claim for Relief**

293.      The Plaintiffs claim:

    a.   compensatory damages in an amount to be determined at trial.

    b.   for all other relief that the Court considers equitable.

**G.2    COUNT III.2:   BREACH OF SECTION 208 OF THE CORPORATIONS ACT 2001 (CTH) – UNLAWFUL RELATED PARTY TRANSACTIONS AND REMEDY UNDER SECTION 1317H**

294.    The Transactions, specifically the issue of equity to Crocker and any other Directors pursuant to the Prepackaged Plan, constituted related party transactions for the purposes of section 208 of the Corporations Act.

295.    For a public company to give a financial benefit to a related party, shareholder approval must be obtained. At all relevant times JRV was a public company subject to the related party rules under section 208 of the Corporations Act.

296.    A Director and CEO is a related party.

297.    The Transactions constituted a related party benefit pursuant to section 208.

298.    The Transactions concealed the ultimate benefit to be given to some or all of the Directors, particularly Bryce Crocker, in the form of Management Incentive Plan in the Restructure Plan.

299.    This was not on arm's length terms.

300.    Because of the Scheme or otherwise, some or all of the Directors and further or alternatively Millstreet knew that the entry into the Initial Bond Transaction, *further or alternatively*, some or all of the subsequent Transactions, would lead to a benefit to some or all of the Directors. This remuneration was not reasonable when the shareholders' equity was being extinguished without their knowledge or approval.

301.    Further, even if the Initial Bond Transaction did not confer a related party benefit in isolation, given the significance of the Chapter 11 and the Prepackaged Plan in giving benefits to some or all Directors, at the expense of the shareholders, the entry into the the Chapter 11 should have been made subject to shareholder approval.

302.    The failure to obtain shareholder approval constitutes a contravention of section 208 and has resulted in financial loss to the shareholders.

303.    Plaintiffs seek relief under Section 1317H of the Corporations Act, which provides that a court may order a person to compensate a company for damage suffered as a result of a contravention of the Act.

304.    As a direct and proximate result of the Directors' misconduct, JRV and its shareholders have suffered financial harm, including but not limited to the dilution of shareholder value due to the improper financial benefits granted to insiders.

50

**Claim for Relief**

305.    Pursuant to Section 1317H, Plaintiffs seek a court order compelling the Directors to compensate JRV for any improper financial benefits obtained; for all other relief that the Court considers equitable.

## H.    COUNT IV:    SHAREHOLDER OPPRESSION INCLUDING UNDER SECTION 232 OF THE AUSTRALIAN CORPORATIONS ACT 2001 (CTH)

**Plaintiffs repeats all allegations** contained in the preceding paragraphs as if fully set forth herein through Count IV and its associated subsections.

### H.1    CIRCUMSTANCES OF OPPRESSION

306.    There is a significant substratum of facts supporting that the circumstances of the entry into one or more of the Transactions was oppressive to all of the shareholders of JRV, including the Appellants and the Class, who subsequently lost all of their investment in JRV.

**Transactions were not in the interests of shareholders**

307.    It is clear that the Directors were not acting in the interests of shareholders in entry into some or all of the Transactions.

308.    The Initial Bond Transaction was said to have been entered into in order to avoid entry into low priced cobalt offtake agreements; yet the transaction contemplates an off-take agreement.  Further, it would have been in the shareholders interest to enter into offtake agreements in the ordinary course of business rather than lose all of their equity.

309.    The RSA was stated in the 2 January Announcement to be for the benefit of vendors, suppliers and employees. It was <u>not</u> stated to be in the interests of <u>shareholders</u>; and in fact it confirmed that there would be no return for shareholders.

310.    There is no doubt that it would have been better for the shareholders if the Chapter 11 bankruptcy was not undertaken without their approval, or if a capital restructure was undertaken with their input, or any other transaction or winding up was undertaken which did not enrich the Directors and management at the expense of the shareholders.

**Shareholder**                                                                                   **approval**

311.     The Transactions were not brought to shareholders for approval.

312.     The decision to enter into one or more of the Transactions without shareholder approval was a decision that *no reasonable director could have made.*

313.     Shareholder approval was required pursuant to the Listing Rules, further or alternatively pursuant to section 208 of the *Corporations Act* (2001) (Cth).

314.     The shareholders were not provided with an opportunity to vote on the Initial Bond Transaction or any of the subsequent Transactions.

315.     Further or alternatively, even if  no shareholder approval was required under the ASX Listing Rules or as a related party transaction, the conduct was oppressive, and shareholder approval should have been obtained because of the conflicts of interest of the Directors.

**Additional**                                        **Commercial**                                        **Unfairness**

316.     The Transactions were undertaken in the context of the Misrepresentations. Most particularly, the series of Transactions was not in accordance with representations that indicated that JRV was progressing in the interests of shareholders; was looking for transactions to strengthen the balance sheet and was endeavouring to trade through its crisis in their interests and with their support.

317.     There was commercial unfairness with the content of and procedural entry into the Transaction(s):

   a.  As noted above, the ICO Bonds pursuant to the Initial Bond Transaction were complex and on very poor terms for the shareholders.

   b.  The terms of the Bonds were onerous.

   c.  The Bond terms were not explained properly to the shareholders.

   d.  As the Transactions unfolded, more and more security was taken over the shareholders' assets, by the Finland Transfer and the Brazil Transfer.

   e.  The ultimate ARRSA and Prepackaged Plan sought to extinguish the shareholders' capital; by virtue of proceedings in another jurisdiction; which still have not been properly explained to the shareholders.

    f.   The nature and content of the Chapter 11 meant that the shareholders of JRV could not adequately represent their interests in the proceeding as they would if the proceedings had been conducted in Australia.

    g.   The Plaintiffs, being representatives of the Class, did not understand any of the Transactions, and no reasonable ordinary member of the Class would have understood them, particularly on the basis of the level of disclosure made.

**Circumstances of JRV may not have necessitated the Transactions**

318.    Further factors which  demonstrate the requisite unfairness:

    a.   It has <u>not</u> been said in any of the public filings that the JRV group was at or was approaching insolvency, even though it has entered into voluntary administration proceedings;

    b.   the company was not insolvent when (1) it entered into the Initial Bond Transaction; or (2) it entered into any of the further Transactions; or  (2) it was placed into the bankruptcy proceedings and/or JRV did not need to file for Chapter 11 protection in the United States. The Debtors are filing as a solvent filer.

    c.   it was not stated in any of the Waiver documents that the interest payments or other obligations could not be made by  JRV or that formal demands were met which could not be paid; it appears that JRV had some cash and/or liquid assets on hand; and

    d.   discovery and expert evidence is required to determine whether we may be able to ascertain that interest payments could have been made or negotiated and/or insolvency or the entry into one or more of the Transactions avoided in the proper interests of the shareholders  (See Further Annexure B).

**Directors'                     Equity               and                     Self-Dealing**

319.    Further:

    a.   the Directors were issued with equity and benefits to an unreasonable extent during the period leading up to and immediately prior to the Transaction on May 9, 2025 (including the **Long Term Incentives**);

    b.   some or all of the Directors secured resultant management equity in the Reorganised Parent (see the New Management Incentive Plan); and

c.  some or all of the Directors secured the New Roles or roles on the New Boards in the reorganised parent and its subsidiaries, indicating a conflict of interest. (The names of the Directors who will sit on the New Boards have been withheld).

320.     As noted above, at various points leading up to and after the Initial Bond Transaction, equity was issued to directors.

321.     The Long Term Incentives were issued  at a time when the ASX had been told that costs were being cut and that no short term incentives were being provided (see **Incentives Representations**).

322.     Awards at zero dollars entailed substantial amounts (e.g., March 3, 2024 award of 31,767,022 shares to Bryce Crocker for 0 dollars consideration), an award of 31M shares, immediately prior to the first Waiver.


**Circumstances   arising   from   the   Transactions,   particularly   the   Chapter   11**

323.     One or more of the Transactions were oppressive to the shareholders, including the Class and the Appellants, because:

c.  there was misleading and inadequate disclosure in breach of securities laws in the US, Australia and/or Canada; and/or

d.   the shareholders were not given an opportunity to participate in alternative financing options for JRV; and/or

e.  the shareholders were not given an opportunity to participate in the Chapter 11 reorganisation and contribute capital to avoid dilution or extinguishment of all of their value; and/or

f.  the Prepackaged Plan sought to extinguish the rights of the shareholders in JRV; and

g.  the Plan purported to release any claims of shareholders; and

h.  the Plan purported to contain an "opt-out" from releases which was unsuccessful, unenforceable and was designed to deprive shareholders of their equity in JRV; and

i.  the Prepackaged Plan was formulated in circumstances of solvency or, alternatively, potential solvency; and/or

j.  the Prepackaged Plan was formulated in secret without taking the position and interests of shareholders into account; and/or

k.  the Prepackaged Plan was formulated in breach of the fiduciary duties of the directors of the JRV and/or Jervois USA; and/or

l.  the Prepackaged Plan was deliberately designed to remove all of the shareholders' rights using a method which they could not understand or in which they struggled to be involved, given that the JRV is incorporated and listed in Australia; and/or

m.  the Pre-packaged Plan was deliberately designed to take the bankruptcy out of the jurisdiction of control or influence of the JRV and its shareholders, intentionally to obstruct the Australian shareholders and ensure that they did not have timely, equal or fair access to representation, attendance and/or participation in the Chapter 11 bankruptcy proceedings; and/or

n.  the Prepackaged Plan benefited management and certain of the Directors by granting them roles in the newco and Management Equity, without full and fair disclosure to shareholders; and/or

o.  the Prepackaged Plan concealed the identity of the directors who would sit on the New Board(s) of the reorganised parent; and/or

p.  the Prepackaged Plan, and/or its underlying financing documents, should have been but were not subject to shareholder approval; and/or

q.  Chapter 11 was not used for a proper purpose; and/or

r.  the directors of the Parent entered into an agreement with MillStreet to deprive the shareholders of the company of their capital, without full disclosure and without taking their rights into account, and in circumstances where certain Directors and/or management stood to directly benefit from the transaction at the expense of shareholders; and/or

s.  because it has not been disclosed to them, the shareholders are not aware of, and are not able to assess, the full circumstances of the Debtors (being the JRV Entities) at the time that the Prepackaged Plan was being propounded or agreed (**Debtor Circumstances**); and/or

t.  the shareholders are not aware of the nature or history of the negotiations or discussions or agreements between the Debtors, Millstreet, and the directors or management of JRV and/or Jervois USA in the lead up to the Prepackaged Plan being propounded or agreed;

u.  subject to discovery, the directors of the Parent and/or the directors of Jervois USA and/or Millstreet knew, or ought to have known, the above;

## H.2    COUNT IV: REQUEST FOR AN ORDER UNDER SECTION 232 OF THE CORPORATIONS ACT

**Plaintiffs repeats all allegations** contained in the preceding paragraphs as if fully set forth herein through Count IV and its associated subsections.

324.    Due to the circumstances of oppression alleged in section H.1 above, and the other matters pleaded in this Complaint, JRV and some or all of its Directors **engaged in conduct that is oppressive, unfairly prejudicial, or unfairly discriminatory** against minority shareholders, in violation of **Section 232 of the Corporations Act 2001 (Cth)** (**Oppression**).

325.    On the basis of information and belief, and subject to discovery, Millstreet knowingly participated in the Oppression.

**Statutory test**

326.    Court may make an order under section 232 if:

  a.  *the conduct of the company's affairs; or*

  b.  *an actual or proposed act or omission by or on behalf of a company;* or

  c.  a resolution, or a proposed resolution, of members or a class of members of a company,

was:

  d.  *contrary to the interests of the members as a whole;* or

  e.  oppressive to unfairly prejudicial to, or unfairly discriminatory against a member or members.

**Claim for Relief**

327.    Plaintiffs respectfully request that this Court enter judgment against Defendants and grant relief under **Section 233 of the Corporations Act 2001 (Cth)**, including but not limited to:

A. an order requiring Defendants to compensate the Class for financial losses suffered due to oppressive conduct, pursuant to Section 233(1)(h);

B. an order requiring the Defendants to buy back the shares of the Class at a fair market price, pursuant to Section 233(1)(d);

C. an order setting aside the Bankruptcy Order and the Australian Proceeding; and

D. for all other relief that the Court considers equitable.

## I.      COUNT V:     STATUTORY DERIVATIVE ACTION (SECTION 236 AUSTRALIAN CORPORATIONS ACT (2001) CTH)

**Plaintiffs repeats all allegations** contained in the preceding paragraphs as if fully set forth herein through Count V and its associated subsections.

328.      The Plaintiffs bring this claim derivatively..

## I.1      RELEVANT PRINCIPLES

**Statutory test**

329.      Section 236-237  of the Corporations Act (2001) (Cth) allows members to bring proceedings against Directors including for breaches of directors' duties provided they are granted leave of the Court to do so.

330.      Leave may be granted if the court is satisfied that:

    a.   it is probable that the company will not itself bring the proceedings or properly take responsibility for them or the steps in them;

    b.   the applicant is acting  in good faith;

    c.   it is in the best interests of the company that the applicant be granted leave; and

    d.   the applicant is applying for leave to bring proceedings and  there is a serious question to be tried; and

    e.   either 14 days before notice was given or it is appropriate to grant leave even though it is not satisfied.

## I.2      DIRECTORS' DUTIES BREACHES

**Section 180 - Duty of care and diligence**

331.      Pursuant to section 180 of the Corporations Act:

a. A director or other officer must exercise their powers and discharge their duties with the degree of care and diligence that a reasonable person would exercise if they were a director or an officer in the corporation's circumstances and occupied the same office with the same responsibilities as that person.

b. Business judgement rule: it is a defence to section 180 if the director or officer makes a business judgement in good faith for a proper purpose; did not have a material personal interest in the subject matter of the judgement; inform themselves about the subject matter of the judgement to the extent they reasonably believe to be appropriate; and rationally believe that the judgement is in the best interests of the corporation (and there is a presumption that it is unless the belief is one that no reasonable person in their position would hold).

332.    The  Directors breached their directors' duties by enter into one or more of the Transactions, for the following reasons:

c. Section 180 of the Corporations Act provides that directors must use their care and diligence of a person with their level of skill.

   i. The directors were extremely sophisticated business people.  Many of them had worked at Glencore.  The Chairman had significant experience, as did the CEO.

   ii. The Board's decision to enter into the Initial Bond Transaction, and subsequent Transactions, without shareholder approval should be considered in that light.

d. Directors accepted the Bond terms on extremely restrictive terms in the first instance without a proper basis.  The justification was to "not enter into offtake agreements".   However, entry into offtake agreements was the primary business of the company which the shareholders trusted the Directors to conduct.  The Directors did not act with reasonable diligence, care or skill in pledging assets of Jervois USA, on the basis that they did not want to enter into offtake agreements as an alternative.

e. When the Initial Bond Transaction then turned out to be egregious for JRV,  and Millstreet advanced on JRV, the Directors did not stop and seek shareholder approval at that stage.  Rather than seeking the input of the shareholders, for example, by way of approval of their decisions or seeking further capital from the shareholder base, then Directors instead engaged in self-dealing in the

Transactions.  They could have sought shareholder approval or returned the assets to the shareholders if the company was no longer viable.

f.   The directors' decision to enter into the Transactions, particularly the Prepackaged  Plan, when some or all of them maintained a material personal interest in the outcome, means that the business judgement defence is not available.

g.   The later Transactions and the entry into the RSA, ARRSA and Chapter 11 could not be rationally seen to be in the best interests of the shareholders by any reasonable person.

h.   A director or officer acting properly, instead of entering into one or more of the Transactions would have:

   i.   undertaken a rights Issue/request for capital;

   ii.   transparently informed shareholders of the detail of Transactions in order to give them an opportunity to sell their shares;

   iii.   asked for a shareholder approval;

   iv.   sold the company's assets and returned the distribution to the shareholders; or

   v.   not to have entered into the debt in the first place and funded working capital from the shareholders or sold assets; or sold more cobalt pursuant to offtake agreements.

333.   Accordingly, the Directors breached their duties under section 180 of the Corporations Act.


**Section 181  - Duty of good faith and proper purpose**

334.   Pursuant to section 181 of the Corporations Act:

a.   A director or other officer must exercise their powers and discharge their duties in good faith in the best interests of the corporation and for a proper purpose.

b.   The best interests of the corporation means the shareholders as a whole (*not other stakeholders*).

335.   Some or all of the Directors did not act in good faith, rather acted pursuant to the Scheme and the circumstances of oppression.

336.   Some or all of the Directors did not act for a proper purpose, being in the best interests of the shareholders (including the Class):

    c.   There is no justifiable basis on which it could be argued that entry into any of the Transactions, particularly the RSA, ARRSA or Chapter 11 was in the interests of the shareholders, when their rights were purportedly entirely extinguished, including purportedly their right to make a claim in relation thereto.

    d.   The Board preferred the rights of vendors, suppliers and employees over the rights of shareholders in entry into the RSA, ARRSA and Chapter 11. Accordingly, they breached their basic and fundamental directors' duties.

    e.   The 2 January Announcement did not say that JRV was acting in the best interests of creditors because it was approaching insolvency; rather the stakeholders preferred were vendors, suppliers and employees,

    f.   The Directors also acted in their own interests.

337.    Pursuant to section 181 of the Corporations Act some or all of the Directors breached section 181 by entering into one or more of the Transactions  in these circumstances and for these purposes, without shareholder approval.

**Section 182-183 - Duty to avoid conflicts of interest**

338.    Section 182 provides that a director, secretary, other officer or employee must not improperly use their position to gain an unfair advantage for themselves or someone else or cause detriment to the company.

339.    Section 183 applies the same test in the case of use of information.

340.    The provision is designed to ensure that officers cannot abuse their fiduciary duty to prevent conflicts arising between the officer's personal interest and the company's interest and the obligation to act only in the best interests of the company.

341.    In receiving the New Management Incentives, New Roles and roles on the New Boards as part of the Pre-packaged Plan, some or all of the Directors engaged in a conflict of interest; they improperly used their position and the information to which they were a party to self-deal, at the expense of the shareholders of JRV and the Class.

342.    Accordingly, some or all of the Directors breached section 182 and 183 of the Corporations Act.

**I.3    MILLSTREET**

343.    Subject to information and belief, and to discovery, Millstreet were actively involved, and knowingly participated, in the breach of directors' duties.

## I.3    CLAIM FOR RELIEF

344.    The Plaintiffs request the Court to grant leave for them to bring a derivative claim for compensatory damages in an amount to be determined at trial; and for all other relief that the Court considers equitable.

## J.    COUNT VI. SHAREHOLDER OPPRESSION AND BREACH OF FIDUCIARY DUTY UNDER THE LAW OF THE STATE OF NEVADA

**Plaintiffs repeats all allegations** contained in the preceding paragraphs as if fully set forth herein through Count VI and its associated subsections.

**Piercing the corporate veil - first piercing - Jervois USA is a mere instrumentality**

345.    Plaintiffs and the Class are shareholders of JRV.

346.    JRV which fully owns and controls Jervois Mining USA Limited, a company registered in the State of Nevada with registration number NV19881021842. (**Jervois USA**).

347.    JRV exercises complete operational control over Jervois USA.  The directors of the Australian parent also control the Jervois USA subsidiary's board, making the subsidiary a mere instrumentality of JRV. Jervois USA had no true independence in decision-making.

348.    Jervois USA held the key asset of JRV and the group (**Jervois Group**).

349.    The JRV Directors, *further or alternatively*, together with the directors of Jervois USA, entered into the Initial Bond Transaction and the Second ICO Lien, and entered into the further Transactions, including the RSA, the ARRAS and the Chapter 11.

350.    By using Jervois USA to funnel assets away from the parent company's legitimate shareholders, JRV and the Directors created an alter ego relationship between the parent and the subsidiary.

**Piercing    the    corporate    veil    -    second    piercing    -    Directors    of    parent**

351.    Some or all of the directors directly controlled and dominated the parent company, using their positions as directors and officers to:

    a.  extract value for their personal gain rather than benefiting all shareholders;

    b.  deny financial disclosures and governance rights to shareholders.

13. By using the corporate structure to shield liability, some or all of the Directors  have engaged in shareholder oppression and corporate waste.

## J.1    COUNT    VI.1    SHAREHOLDER    OPPRESSION    (NRS    78.650)

## Circumstances    of    Oppression

352.    Plaintiffs incorporate all preceding allegations including without limitation the circumstances of Oppression pleaded in section H and elsewhere.

353.    Some or all of the Directors abused their positions of power to improperly pledge the assets of Jervois USA as collateral for personal benefit, without fair consideration to the shareholders of JRV.

354.    Some or all of the Directors engaged in self-dealing by transferring assets and revenue streams from Jervois USA to insider-controlled entities in the Reorganised Parent, stripping the parent company JRV of valuable holdings and stripping the shareholders of their assets in JRV.

355.    The Directors failed to disclose these actions to the shareholders, constituting corporate waste and a breach of director's duties (and all of the Misrepresentations referred to above are referred to and repeated).

356.    The breaches of directors duties referred to in section I above are referred to and repeated.

## Application of NRS 78.650

357.    As a result of this misconduct, JRV and its shareholders have suffered substantial financial harm.

358.    Under Nevada Revised Statute (**NRS**) 78.650, minority shareholders can sue for corporate oppression when directors engage in:

    a.  mismanagement or asset misappropriation.

b. denying shareholders rightful participation in corporate governance.

c. engaging in transactions that harm shareholder value.

359. JRV, *further or alternatively*, in the context of the associated breaches of fiduciary duty, the Directors and/or the Jervois USA directors (whose names are not currently known) engaged in oppression by:

a. using Jervois USA to transfer assets out of reach of JRV's shareholders.

b. denying shareholders the value of their investment in JRV and the assets of Jervois USA; and

c. excluding Plaintiffs and the Class from corporate decision-making which should have been subject to their approval;

d. denying financial benefits to JRV's shareholders and extinguishing all of their rights;

e. using JRV's control over the Jervois USA to extract assets of the Group for insider benefit;

f. preventing shareholders from exercising rights in corporate governance as a result of the Chapter 11 bankruptcy proceedings.

360. The oppression harmed the shareholders of JRV, who were or are the ultimate owners of Jervois USA and the Jervois Group, warranting relief under NRS 78.650.

**Claim for Relief**

361. Plaintiff seeks relief by way of an injunction to prevent ongoing shareholder oppression and breach of fiduciary duty, for the reversal of the Transactions, *further or alternatively*, damages in an amount to be determined at trial; and for all other relief that the Court considers equitable.

**J.2    COUNT VI.2  RELIEF UNDER SECTION NRS 78.747**

362. Under NRS 78.747, personal liability can be imposed if:

a. the corporation is influenced and governed by the person;

b. there is such unity of interest and ownership that the corporation and the person are inseparable;

    c.  adherence to corporate separateness would sanction fraud or promote injustice.

363.    As a result of the matters alleged herein, there was no legitimate separation between the Directors, JRV and Jervois USA.

364.    As a direct and proximate result of Defendants' double veil piercing misconduct, Plaintiff and other minority shareholders suffered harm as articulated in paragraph [358].

**Claim for Relief**

365.    The Plaintiffs seek:

    a.  A judicial declaration that Jervois USA was a mere alter ego of JRV, and its corporate separateness should be disregarded.

    b.  A judicial declaration that JRV was a mere alter ego of the Directors, and its corporate separateness should be disregarded.

    c.  An order piercing the corporate veil at both levels, holding relevant Directors or John Doe directors of Jervois USA personally liable for the financial harm they caused to the JRV and its shareholders.

    d.  Compensatory damages in an amount to be determined at trial.

    e.  Disgorgement of profits and assets improperly transferred from Jervois USA and lost in the bankruptcy proceedings; and

    f.  For all other relief that the Court considers equitable.

**J.3    COUNT VI.2  RELIEF UNDER SECTION NRS 78.138**

366.    Plaintiffs bring this claim derivatively and note that a notification to the existing company and Board would be futile.

367.    The directors of Jervois USA owed fiduciary duties to act in the best interests of JRV which ultimately was owned by the shareholders.  In the result, it owed an obligation to act in the best interests of the shareholders and the Class.

368.    The Plaintiffs refer to and repeat the allegations in section I insofar as they relate to the directors of Jervois USA.

369.    Those breaches of directors' duties apply equivalently to the shareholders, and ultimate shareholders, of Jervois USA.

**Claim for Relief**

370.    The Plaintiffs request the Court to grant leave for them to bring a derivative claim for compensatory damages in an amount to be determined at trial; and for all other relief that the Court considers equitable.

## VI. PRAYER FOR RELIEF

WHEREFORE, Plaintiff(s) request that the Court:

1. Certify this action as a class action under Rule 23 and appoint Plaintiff(s) as class representatives;

2. Award compensatory damages for violations of U.S., Australian, and Canadian securities laws and loss arising from the resultant change in value of the stock price of JRV during the period from July 5, 2021 to January 2, 2025 where such decline resulted from the reversal of an artificial inflation based on a misrepresentation; and/or arising from the extinguishment of the equity of the Class;

3. Award compensatory damages arising from the civil conspiracy;

4. Award damages arising from the oppression to shareholders; *further or alternatively*, order the Defendants to pay the Plaintiffs and the Class the fair market value of their shares as at January 2, 2025;

5. Enable the claims of breaches of directors' duty against the Directors to proceed as statutory derivative actions and provide relief for breaches of directors' duties including by way of damages;

6. Order disgorgement of any or all ill-gotten gains by the Defendants in particular the Directors;

7. *Further or alternatively*, reverse and vacate the Bankruptcy Court's order dated March 6th, 2025;

8. *Further or alternatively*, stay the Bankruptcy Court's proceedings, unwind the Prepackaged Plan and the Australian Proceedings and the impacts thereof;

9. Award Punitive damages including but not limited to treble damages of any monetary award;

10. Award attorneys' fees and costs;

11. An accounting across all Defendants;

12. Injunctive and emergency relief to limit currently in progress irreparable harm to the Class and/or assets of the underlying JRV Entities including but not limited to the

motion for the emergency and consolidation. The motion for stay and consolidation is appended hereto and also filed through the parallel proceeding in the United States Bankruptcy Court for the Southern District of Texas.; and/or

13. Grant such further or alternative equitable relief as the Court deems appropriate.

Dated:    3/20/2025                                    **Respectfully Submitted,**

**RS McCrosson LLP**

Ryan McCrosson (Indiana # 29710-53)
*Pro Hac Vice Pending*

Laura Keily (VIC, Australia # P0017753)
*Pro Hac Vice Pending*

8888 Keystone Crossing STE
Indianapolis, IN 07640
ryan.mccrosson@rsmccrosson.com
(917) 744-9850

Attorneys for Appellants Kadoo Pty Limited and Binvid Pty Ltd. and Binvid Pty Ltd.

**JURY DEMAND**

Plaintiff(s) demand a trial by jury on all issues so triable.

**RS McCrosson LLP**

Ryan McCrosson (*pro hac vice* pending)
Laura Keily (*pro hac vice* pending)

**CERTIFICATE OF SERVICE**

Service has not yet been completed. A Certificate of Service will be filed promptly upon service

66

**RS McCrosson LLP**

Ryan McCrosson (*pro hac vice* pending)
Laura Keily (*pro hac vice* pending)

**ANNEXURE A**

Subject to expert evidence, the Plaintiffs allege the following and provide the same in aid of the Court.  The below outlines the organizational structure and interrelationships of JRV at relevant times in its aforementioned history.



ANNEXURE B

Subject to expert evidence, the Plaintiffs allege the following and provide the same in aid of the Court.  The below outlines the financials of JRV at relevant times in its aforementioned history.

**Quarter Ending 31 March 2024**

1.  On 30 April 2024, the Quarterly Activities Report for the quarter ended 31 March 2024 was released.
2.  The announcement states that project order books for EVs are expected to expand rapidly from 2025; it is not clear whether JRV departed from this statement.
3.  The Report notes that expenditure is being cut including to management and that no short term incentives are being made.
4.  Cash on hand is $26.6M and the Quarterly Activities Statement dated on this date showed that JRV has 1.5 quarters of working capital/cash remaining.  The financial position improved between April and June.

**Quarter Ending 30 June 2024**

1.  As per the Quarterly Activities statement dated 30 June 2024, JRV maintained between **$16M to $21M** in cash, and approximately $30M in cobalt assets at the time of the first interest waiver.
2.  The Quarterly Activities Statement dated on this date showed that JRV  had 5.3 quarters of working capital/cash remaining.
3.  JRV did not answer any of the insolvency questions and said they were not applicable.
4.  JRV had a total amount of financing facilities of $275M; and the amount drawn was stated to be $169M; therefore there may have been approximately $106M available to draw (which may have been for limited purposes).
5.  JRV was likely not insolvent as at the date of the first waiver on 9 May 2024 or at the date that the interest payment was due in July 2024.
6.  In addition total cash and cash on hand equivalents were $21.349 therefore the interest payments could have been made in July 2024.

**Quarter Ending 31 October 2024**

1.  As at 31 October 2024, cash on hand is $15M and JRV has  2.2 quarters remaining.

**Quarter Ending 31 December 2024**

1.  The Quarterly Activities Report for the year ended 31 December 2024 released on 31 January 2025, assumes that the Recapitalisation Agreement has been signed.
2.  As at the date of the US bankruptcy, the JRV Group had US$14M cash and unused financing facilities of US$16.M, total available to deploy was $31.3M with 2.7 quarters working capital/cash remaining.
3.  JRV stated that it had total facilities available of $307M and that $184M had been drawn; therefore there ought to have been $122M available to draw (which may have been for limited purposes).  At section 7.5 of Annexure B JRV lists only $16.5M of unused financing facilities available at quarter end.
4.  JRV carries this forward to estimate its cash flow available for future activities.  The depressed amount of $16.5M results in a conclusion that the estimated quarters of funding available are 2.7.
5.  Working capital was robust with US$24.5M secured in late November, approximately two months before filing for the Chapter 11.